Joshua B. Cooley (AK#1409065)
Katherine Elsner (AK#1411116)
**EHRHARDT, ELSNER & COOLEY**
215 Fidalgo Ave, Suite 201
Kenai AK 99611
Phone: (907) 283-2876
Fax: (907) 283-2896
josh@907legal.com
katie@907legal.com

Gary M. Klinger*
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
Email: gklinger@milberg.com

\* *Pro Hac Vice* forthcoming

***Attorneys for the Plaintiff and Proposed Class***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| Luke Layman, individually and as representatives of a class of similarly situated participants in the Cook Inlet Region 401K Retirement Plan, and on behalf of the Plan, <br><br> Plaintiff, <br><br> v. <br><br> Cook Inlet Region, Inc., CIRI Board of Directors, Members of and the Plan Committee, JOHN AND JANE DOES 1-30 IN THEIR CAPACITIES AS FIDUCIARIES <br><br> Defendants. | **Civil Action No.:** <br><br> **CLASS ACTION COMPLAINT** <br> (Jury Trial Demanded) |

1. Plaintiff Luke Layman ("Plaintiff"), by and through his undersigned attorneys, on behalf of the Cook Inlet Region 401(k) Retirement Plan (the "Plan"), himself, and all others similarly situated, brings this action under 29 U.S.C. §§ 1132(a) (2) and (3) & 409(a) against Defendants (1) Cook Inlet Region, Inc. ("Cook Inlet"), (2) CIRI Board of Directors, (3) Members of and the Plan Committee, and (4) John and Jane Does 1-30 in their capacities as fiduciaries or de facto fiduciaries (collectively, "Defendants"), to remedy Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income & Security Act (ERISA), U.S.C. 29 1001, et seq.

**PLAN INFORMATION**

2. The Cook Inlet Region 401(k) Retirement Plan qualifies as a "large-plan" with assets in 2020-2024 as follows: $375M, $450M, $383M, $486M and $578M. Defined contribution retirement plans are typically classified as: "Micro" plans (less than $5 million in assets); "Small" plans ($5 million to less than $50 million); "Mid" plans ($50 million to less than $200 million); "Large" plans ($200 million to less than $1 billion); and "Mega" plans (more than $1 billion).

3. According to the Plan's Investment Policy Statement (IPS), "Cook Inlet Region, Inc. ("CIRI") is the sponsor of the Cook Inlet Region 401(k) Retirement Plan (the "Plan"), a tax-qualified, defined contribution plan with a cash or deferred arrangement for eligible employees. Participating employers of the Plan include entities under common control with CIRI.

2

4. The Plan designates CIRI as the "Administrator" of the Plan, the authority for which includes selecting and monitoring investment matters under the Plan. CIRI, through the CIRI Board of Directors, has delegated its authority and responsibility as Administrator under the Plan to a Plan Committee (the "Committee"). The CIRI Board of Directors approved an Amended and Restated Charter for the Committee (the "Charter") that identifies the roles and responsibilities of the Committee (as may be amended from time-to-time).

5. This is a defined contribution plan that filed its most recent Annual Return/Report of Employee Benefit Plan (Form 5500) in 2024. The Plan currently has 5,327 active participants and $577,734,000 in plan assets. The plan sponsor's industry is Finance and Insurance.

6. According to the Cook Inlet's U.S. Department of the Treasury and the U.S. Department of Labor reporting each year, The Plan is a 401(k) salary deferral plan covering substantially all eligible employees of the participating employers and is subject to provisions of the Employee Retirement Income Security Act of 1974 (ERISA). The Plan includes participating employers under common control of the Plan Sponsor, Cook Inlet Region, Inc. (CIRI). The participating employers of the Plan that have employees include Alaska Native Justice Center; CIRI; CIRI Development Corporation (DBA North Wind Group); CITC Enterprises, Inc.; Clare Swan Early Learning Center; Cook Inlet Lending Center; Cook Inlet Native Head Start; Cook Inlet Tribal Council; LBYD, Inc.; LBYD Federal, LLC (fka North Wind Infrastructure & Technology, LLC); North Wind Construction Services, LLC; North Wind Dynamics, LLC; North Wind General

3

Contractors, LLC; North Wind Portage, Inc. (fka Portage, Inc.); North Wind Resource Consulting, LLC; North Wind Services, LLC; North Wind Site Services, LLC; North Wind Solutions, LLC; North Wind Technologies, LLC; Silver Mountain Construction, LLC; Southcentral Foundation; The CIRI Foundation; Get Out the Native Vote; and Weld in Construction, LLC (the Employers).

7.     The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). In 2019, the Committee used an Investment Policy Statement (IPS) to select a limited set of fourteen (14) investment options, and in 2023, it selected twenty-five (25) investment options. Participants allocate their wages among the investment options provided by the Committee. The Plan currently offers mutual funds, collective trust funds as investment options for participants. Additionally, the Plan provides a participant-directed brokerage account that enables participants to purchase publicly traded securities.

8.     The Plan's assets are legally owned by and held in the name of the Plan and Trust under the nominee name "Cook Inlet Retirement Plan." Participants do not directly own investments or trust assets; they only beneficially own the trust's assets. According to the independent audits, each participant held a bookkeeping or record-keeping account with Fidelity, which was credited with contributions and allocations of the Company's contributions, along with each investment's earnings, and charged for service providers' compensation payments (i.e., UBS and Fidelity). Allocations are updated every business day after 4 pm based on participant wage deposits, earnings, or account balances, as defined.

4

# INTRODUCTION

9. This case involves multiple breaches of fiduciary duties under the Employment Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA"), by Defendants.

10. ERISA requires fiduciaries of retirement plans to closely monitor plan investments, to remove imprudent investments within a reasonable time, and to make all investment decisions solely in the interest of the plan's participants and beneficiaries. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). ERISA § 409(a) imposes liability on plan fiduciaries to "make good to such plan any losses to the plan." Section 502(a)(2) authorizes participants to bring civil actions to enforce those provisions with respect to the plan as a whole, not individual participants. Claims under § 502(a)(2) are inherently representative in nature, with participants acting as representative agents litigating on behalf of the Plan.

11. Plaintiff found that the Defendants' certified Annual Returns and Reports of Employee Benefit Plans for the plan years 2006 to 2024 (i.e., Forms 5500 at www.efast.dol.gov) indicated that the Plan and its investments were managed on a plan-wide basis by a single Committee that utilized a single Investment Policy Statement (IPS) that included a set of selection and retention factors governing each Plan investment. Thus, if the IPS metrics and financial factors were misapplied to one participant's investment, the misapplication and imprudent decision-making would have affected all investments using a single set of financial factors, and likely affected other Plan and Trust investments.

12. The Defendants and UBS were responsible for regularly evaluating the investment options in the Plan and replacing underperforming funds with more appropriate options.

13. Plaintiff used at least three sources for this Complaint's factual analysis of the Plan's funds and covered service providers, including (1) the SEC prospectus at www.sec.gov/edgar, (2) certified reports to the U.S. Departments of Treasury and Labor (Forms 5500 for 2009 to plan year 2024, available at www.efast.dol.gov), and (3) the Cook Inlet Region 401(k) Retirement Plan Investment Policy (dated January 1, 2022).

14. Plaintiff assessed the Committee's actions in light of the circumstances prevailing at the time of the Committee's conduct and decision-making processes. Plaintiff also used the Defendants' annual participant notice under 29 CFR § 2550.404a-5, which requires plan fiduciaries to compare their chosen fund's returns to "an appropriate broad-based securities market index over the 1-, 5-, and 10-calendar year periods (or for the life of the alternative, if shorter) . . . which is not administered by an affiliate of the investment issuer, its investment adviser, or a principal underwriter, unless the index is widely recognized and used." Plaintiff reviewed Cook Inlet's CFR 2550.404a-5 notice to participants (Cook Inlet's fiduciary disclosure requirement for participant-directed individual account plans) and used the benchmarks in that document, provided the challenged fund and the benchmark index had a sound basis for comparison, such as similar risks, aims, rewards, and characteristics.

15. The fiduciary duty of prudence includes "a continuing duty to monitor plan expenses and `incur only costs that are reasonable in amount and appropriate' with respect

to the services received." *Hughes v. Northwestern Univ.*, 63 F.4th 615, 631 (7th Cir. 2023) (quoting *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016)). "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 738 (2022) (citing *Tibble*, 575 U.S. at 529-30).

16.     As a result of Defendants' breach of fiduciary duty, the Plan's participants and beneficiaries have suffered lost returns and other damages.

17.     Plaintiff therefore brings this case to remedy Defendants' violations of ERISA: (1) that Defendants offered and continued to offer funds that underperformed their benchmark; (2) Defendants failed to act and exchange participants' costly and risky share classes for cheaper, identically managed share classes, and (3) that Defendants engaged in prohibited transactions.

## PARTIES

### I.     Plaintiff.

18.     During the Relevant Time Period, Plaintiff Layman was a United States citizen residing in Anchorage, Alaska, and a participant in the Plan. Plaintiff Layman suffered economic losses as a direct result of the conduct complained of herein. Throughout the Relevant Time Period, Plaintiff Layman paid unnecessary and excessive (1) management fees and revenue-sharing fees authorized by the Defendants, (2) investment advisory fees authorized by the Defendants (to UBS), and (3) sub-transfer agency fees, recordkeeping, and administrative costs (to Fidelity) associated with the Plan. In addition,

Plaintiff Layman invested in certain of the investment options offered by the Plan that are the subject of this lawsuit.

## II. Defendants.

19. Cook Inlet Region, Inc. ("CIRI") sponsors the Cook Inlet Region 401(k) Retirement Plan (the "Plan"), a tax-qualified, defined contribution plan with a cash or deferred arrangement for eligible employees. Participating employers include entities under common control with CIRI. The Plan designates CIRI as the "Administrator" of the Plan, with authority to select and monitor investment matters under the Plan. CIRI, through the CIRI Board of Directors, has delegated its authority and responsibility as Administrator under the Plan to a Plan Committee (the "Committee"). The CIRI Board of Directors approved an Amended and Restated Charter for the Committee (the "Charter") that identifies the roles and responsibilities of the Committee (as may be amended from time to time).

20. Cook Inlet Region, Inc. ("CIRI") is one of 12 land-based Alaska Native Regional Corporations created under the Alaska Native Claims Settlement Act (ANCSA) of 1971. It is a for-profit corporation headquartered in Anchorage, Alaska, dedicated to the economic and social well-being of its shareholders (www.ciri.com). CIRI is the largest private landowner in Southcentral Alaska, managing roughly 1.6 million acres of subsurface estate and 529,500 acres of surface estate. Its diverse investments span 45 states and include sectors such as renewable energy (e.g., the Fire Island Wind farm) and oil and gas leasing.

8

21. Defendants regularly conduct and transact business throughout the State of Alaska, where Plaintiff Layman resides and was employed.

## JURISDICTION & VENUE

22. Subject matter jurisdiction over this matter is conferred upon and vested in this Court under 28 U.S.C. §§ 1331 and 1332.

23. This Court has personal jurisdiction over Defendants because Defendants regularly conduct and transact business within this District, including selling products and services and employing individuals such as Layman, who resided in this District during his employment with Cook Inlet.

24. Venue is proper in this Court pursuant to 29 U.S.C. § 1132(e)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

25. This action has been brought within all applicable statutes of limitations and/or repose.

## DEFENDANTS' FIDUCIARY OBLIGATIONS

26. ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. ERISA's duty of loyalty is "the highest known to the law." See *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). See Restatement (Second) of Trusts § 2 cmt. b (1959)). 29 U.S.C. §1104(a) states, in relevant part: "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and — (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then

9

prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and like aims."

27. Under ERISA's duty of loyalty, Plan fiduciaries must exercise their discretion "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose" of "providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1) (emphasis added). This requires Plan fiduciaries to act with an "eye single" to the interests of Plan participants and beneficiaries and to "exclude all selfish interest and all consideration of the interests of third persons." *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (citation omitted). Fiduciaries violate that duty when they make decisions, even in part, to benefit themselves or third parties.

28. ERISA further "supplements the fiduciaries' general duty of loyalty to the Plan's beneficiaries . . . by categorically barring certain transactions deemed `likely to injure the pension plan.'" *Harris Tr. & Say. Bank v. Salomon Smith Barney*, Inc., 530 U.S. 238, 241-42 (2000); *Cunningham v. Cornell Univ*., 145 S. Ct. 1020 (2025). Among these prohibited transactions, a fiduciary "shall not cause the plan to engage in a transaction" if the fiduciary "knows or should know" that it constitutes a (emphasis added), "transfer to, or use by or for the benefit of a *party in interest*, of any assets of the plan" (29 U.S.C. § 1106(a)(1)(D)) and may not "deal with the assets of the plan in his own interest or for his own account" (29 U.S.C. § 1106(b)(1)).

29. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The

statute states, in relevant part, that: "In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or] (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

30. Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part: "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

31. Importantly, the fact that participants may direct the investment of their contributions in a defined contribution plan account "does not serve to relieve a fiduciary

from its duty to prudently select and monitor any . . . designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d)(2)(iv).

32. Fiduciaries have "the continuing duty to monitor [Plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciaries'] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). Prudence requires a review at "regular intervals." *Id.*

33. "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 530. If "fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022) (citing *Tibble*, 575 U.S. at 529-30).

34. Based on Defendants' conduct, Plaintiff brings this action on behalf of the Plan, and as representatives of a class of participants and beneficiaries of the Plan, asserting claims for a breach of the fiduciary duty of prudence (Count One), for engaging in prohibited transactions and unlawful self-dealing with respect to the Plan in violation of ERISA (Count Two), and for failure to monitor fiduciaries (Count Three). In connection with these claims, Plaintiff seeks to recover all losses to the Plan resulting from Defendants' fiduciary breaches, all profits earned by Defendants in connection with Defendants' breaches, and other appropriate relief.

**III. The Defendants violated ERISA, Restatement of the Law Third, Trusts, and 29 C.F.R. § 2550.404a-1 ("Investment duties").**

35.    ERISA's duty of prudence on plan fiduciaries requires that fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Prudence has two aspects: "'[T]he court focuses not only on [1] the merits of the transaction, but also on [2] the thoroughness of the investigation into the merits of the transaction.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc) (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)).

36.    When assessing procedural prudence, the "court's task" is to determine whether the fiduciaries "'employed the appropriate methods to investigate the merits of the [challenged] investment.'" *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir. 2004) (quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1233 (9th Cir.1983)). Plaintiffs cannot prevail unless they make a showing of procedural imprudence.

37.    Congress wrote ERISA's fiduciary rules in trust-law terms, and the Court has repeatedly said trust principles inform ERISA's meaning. *Varity Corp. v. Howe* (1996) is a good illustration of the Court using trust treatises and trust concepts to explain the function of fiduciary duty as constraining discretionary power beyond specific plan terms. So, Restatements matter in ERISA because ERISA itself invites trust-law guidance—especially for: (1) § 404(a) duties (prudence/loyalty), and (2) § 406 prohibited transactions (self-dealing/conflicts, closely analogized to trust "no further inquiry" ideas).

38.     In ERISA cases, the Supreme Court treats trust law as the interpretive backdrop for ERISA's fiduciary provisions. The Restatements of Trusts matter because they are one of the Court's most-used "trust law" distillations—often supplying the default rules and concepts when ERISA's text is general (e.g., "prudence," "loyalty," "appropriate remedies") or when lower courts adopt cramped interpretations.

39.     A clear example is *Tibble v. Edison International* (2015). The Court emphasized that ERISA's duty of prudence is "derived from the common law of trusts" and used trust-law principles to recognize an ongoing duty to monitor and remove imprudent investments, not just a duty at the time of initial selection.

40.     In *Fifth Third Bancorp v. Dudenhoeffer*[1] the Supreme Court referenced trust law standards for evaluating prudence. In *Hughes v. Northwestern*[2] the Supreme Court applied trust law principles to excessive fee claims.

## <u>FACTUAL ALLEGATIONS</u>

**The Defendants repeatedly subordinated participants'
returns by imposing additional management and revenue-
sharing expenses that reduced yields and returns.**

41.     The Defendants repeatedly subordinated participants' returns by placing investments on their menu that included excessive, nonproductive, and wasteful compensation for portfolio managers in an effort to outperform a meaningful benchmark. This rarely occurred. Second, the Defendants' continuous failure to evaluate the extra costs of portfolio managers' compensation and the additional risks from concentrated portfolios

---

[1] *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014).
[2] *Hughes v. Northwestern University*, 595 U.S. 170, 142 S. Ct. 737, 211 L. Ed. 2d 558 (2022).

against meaningful benchmarks with similar aims, risks, rewards, and characteristics exacerbated losses. Third, the Defendants failed to ensure that the Committee's strategies for selecting managed investments actually resulted in enhanced returns for participant investors in those managed funds.

42. With respect to an investment or investment course of action taken by a fiduciary of an employee benefit plan pursuant to the fiduciary's investment duties, "the requirements of section 404(a)(1)(B) of the Act, set forth in paragraph (a) of this section, are satisfied if the fiduciary: (i) [h]as given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action…"

43. The words "'appropriate consideration' shall include, but is not necessarily limited to: (i) [a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties) or menu, to further the purposes of the plan, taking into account the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action, compared with the opportunity for gain (or other return) associated with reasonably available alternatives with similar risks."

44. The Defendants failed to ensure that (1) available alternative investments were considered (i.e., cheaper, identically managed classes), (2) their investment courses of action were based on factors the fiduciary reasonably determined were relevant to a risk

15

and return analysis, and (3) appropriate investment horizons were used in accordance with the Plan's investment objectives and the Plan's funding policy. The ERISA Fiduciary Law 2024 Update from Bloomberg Law discussed this matter in chapter four, section 4.III.B. under "Establishment of a Funding Policy," stating (emphasis added):

> Every plan must include a procedure for establishing and carrying out a funding policy that is consistent with the objectives of the plan and the requirements of ERISA. See ERISA §402(b), 29 U.S.C. §1102(b). *Fulfilling this requirement is typically the responsibility of the named fiduciary.* The DOL regulations suggest that such a policy, although referred to as a funding policy, does not pertain to the actual funding of benefits provided under a plan or to the amount or timing of contributions to fund benefits, *but instead to an overall investment policy for the assets*, if any, of the plan.[3]

> Furthermore, the legislative history of ERISA specifies: [t]his procedure [of establishing a funding policy] is to enable the plan fiduciaries to determine the plan's short-and long-run financial needs and communicate these requirements to the appropriate persons. * * *

> *Because the funding policy will constitute a "road map" for the investment of plan assets and directly affect the gain or loss of value of plan assets, a named fiduciary should exercise great care in establishing the policy.* The *funding policy, in the form of investment guidelines*, is an important factor in a plan's ultimate investment performance. In fact, *courts have ruled that investment guidelines can become plan instruments or, at a minimum, plan documents. Murphy v. Verizon Commc'ns, Inc.,* 587 F. App'x. 140, 146 (5th Cir. 2014).

45. Plaintiff requested a copy of Cook Inlet's Funding Policy, but his request was denied. A fiduciary must not consider collateral, non-economic, or non-pecuniary

---

[3] See, e.g., 29 C.F.R. § 2509.94-2 (Interpretive bulletin relating to written statements of investment policy, including proxy voting guidelines); 29 C.F.R. §2509.75-5, FR-4; see also *Voyk v. Brotherhood of Locomotive Eng'rs*, 198 F.3d 599, 603–04 (6th Cir. 1999) (stating that "[t]he statute requires only that a plan 'provide a procedure for establishing and carrying out a funding policy … '" and not a specific amount of contributions); *White v. Martin*, 286 F. Supp. 2d 1029, 1039–40 (D. Minn. 2003); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998) (determining that although ERISA does not contain a specific requirement that a written investment policy be maintained by the trustee, the lack of a written investment policy, coupled with other acts and omissions by the trustees, constituted a breach of fiduciary duty).

factors when evaluating the return versus risk of Plan investments—such as choosing investments that reduce participants' earnings without providing economic benefits to cover these costs.

**An example of the wasteful costs is illustrated below.**

46. Cook Inlet, named Plaintiff and participant, owned the 2055 and 2065 Fidelity Freedom target-date fund ("TDF"). Because the K6 class was twenty basis points (0.20%) less expensive than the K class, the participants' returns for the K class lagged those of the K6 class by more than that amount every year, due to the lost compounding from the extra fees. Table one, about four paragraphs below, shows that the twenty basis points in extra fees caused the K class to lag the cheaper, identically managed K6 by over thirty basis points, or fifty percent more than the 20 basis points cost.

47. Plaintiff equates the extra 20 basis points to a $480 loss over three years (2020, 2021, 2022), using Excel, with the Form 5500 average account balance of $84,861 (PV), a RATE of (11.69 minus 11.51), and a period (NPER) of 3 years, for not allowing participants to own the cheaper, identically managed K6 class. This calculation included the average participant annual contribution of $6,063 (plan years 2020-2023) but not the employer's average annual contribution of $4,664.

48. Plaintiff infers from the 2010 to 2024 Annual Returns/Reports of the Employee Benefit Plan (i.e., Forms 5500 at www.efast.dol.gov) that the Committee and UBS continually sought investments into which participants would defer their wages, and that after the end of a month, Cook Inlet could direct these dollars taken from participants to Fidelity, as the Cook Inlet certified Schedules C prove.

17

49. Due to lost compounding opportunities, using more expensive classes of mutual funds with revenue sharing is highly inefficient. The judge in *Omnicom* summarized that "a more prudent arrangement . . . would have been to select available lower-cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration fees." See *In re Omnicom ERISA Litig.*, 20-cv-4141 (CM), at *1 (Docket No. 1, ¶ 99) (S.D.N.Y. Aug. 11, 2022).

50. A demonstration of the *Omnicom* opinion is below, showing that the prudent use of Plan assets "would have been to select available lower-cost investment funds that used little to no revenue sharing," such as the K6 class. Column 3 shows the 20 basis points directed by the Defendants to pay Fidelity, but the lost opportunity cost in columns 5 and 7 demonstrates the mathematical lunacy of that decision.

*Table 1 If Defendants used the K6 class offered before the K, participants would have 0.33% per year (column 5, bottom) more return over three years and 0.31% per year (column 7, bottom) over five years (data as of 12/31/25).*

| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| Name | Symbol | Expense Ratio | 3-Year Total | Per year Total | 5-Year Total | Per year Total |
| Fidelity Freedom 2055 K | FNSDX | 0.65 | 70.56 | 23.52 | 62.59 | 12.52 |
| Fidelity Freedom 2055 K6 | FCTKX | 0.45 | 71.55 | 23.85 | 64.15 | 12.83 |
| | Difference: | 0.20 | (0.99) | (0.33) | (1.56) | (0.31) |

51. That flawed decision-making continued in plan year 2023 through the use of Fidelity Freedom collective investment trusts and a more expensive Class D. Using the facts above, the Defendants repeatedly violated 29 C.F.R. § 2550.404a-1 ("Investment

duties"). Moreover, the Defendants used revenue-sharing as a financial factor in selection and retention, but they violated the spirit and essence of ERISA because "a fiduciary prudently determines are expected to have a material effect on the risk and/or return of an investment." The effect of revenue-sharing was to increase the cost burden for all target date fund investors, reduce returns every month, and increase the volatility (risk) of every Fidelity Freedom target date fund.

IV. **UBS is not a named Defendant, although based on the IPS, it appears to have participated in the conduct described herein.**

52. Plaintiff reserves the right to seek leave to amend to add UBS as a Defendant. The advisor's duties (UBS) are set forth on page 1 of the Cook Inlet Investment Policy Statement (IPS), section II C 2, and state (emphasis added):

> Investment Advisor. The Plan investment advisors' (if any) duties shall include, but not be limited to, the following:
> (a) Research and assist in selecting investment funds;
> (b) Conduct due diligence monitoring of the investment funds and report to the Committee;
> (c) Notify the Committee of any issue that may impact the investment of Plan assets (e.g., change in ownership, professional staff, etc.);
> (d) Assist the Committee in developing and *reviewing investment strategies*;
> * * *
> (f) Provide reports on the performance of the investment funds on a regular basis;
> (g) Periodically review and evaluate the fees and costs of the Plan including investment management, trust and custody…

53. The Defendants and UBS should have used the K6 class and avoided the more expensive K class (the K6 was introduced on 6/7/2017, before the K class on 7/20/2017).

54.     Plaintiff sees the K and K6 class differences in the SEC-prospectuses at www.sec.gov/edgar. Every Fidelity Freedom fund K prospectus contains a section titled "Payments to Broker-Dealers and Other Financial Intermediaries." It warns,

> These payments may create a conflict of interest by influencing your intermediary and your investment professional to recommend the fund over another investment. The two share classes are treated very differently because the K6 states, "Currently, the Board of Trustees of the fund has not authorized such payments for Class K6 shares of the fund."

55.     This language appears consistently across all Freedom K share classes in the related SEC filings. However, the K6 class was specifically designed as a zero-revenue-sharing class, presumably for plans using outside recordkeepers where the plan sponsor/fiduciary wants a clean fee structure with no embedded sub-transfer agency payments flowing from participants' fund expenses.

56.     Using the K class with 20 basis points of revenue-sharing causes participants to pay this asset-based fee at an increasing dollar value over time. For example, in plan year 2020, the average balance for each participant was $72,255, so each participant paid $144.51 (20 basis points) in revenue-sharing to Fidelity. During plan year 2020, participants' contributions for the year were $8,512, which meant another $17.02 (20 basis points) went to Fidelity for no additional services. In 2020, participants rolled over $6,293,362, so if that amount was paid into the Fidelity Freedom target date funds, another 20 basis points would be sent to Fidelity ($12,587). From 2020 to 2023, participants rolled over $31,794,562.

57.     The Defendants and UBS chose class K when class K6 was available, effectively taking 20 basis points from participants' earnings and paying Fidelity (or its

affiliates) an extra 20 bps per year through the participants' expense ratio, which flows back as revenue sharing. Their actions demonstrate the lack of prudence and loyalty warned about under ERISA ("solely in the interest" and "for the exclusive purposes" of the plan's "participants and beneficiaries"). 29 U. S. C. §§1103(a), (c)(1), 1104(a)(1).

58.     Under 29 C.F.R. § 2550.404a-1 ("Investment duties"), the Defendants were required to select investments based on return versus risk, with the goal of enhancing participants' returns or reducing the risks of their funds, which the U.S. Department of Labor terms a pecuniary factor. The definition of "pecuniary factor" means those financial factors (emphasis added), "a fiduciary prudently determines are expected to have <u>a material effect on the risk and/or return of an investment</u> . . ." and "<u>consistent with the plan's investment objectives and funding policy</u>."[4]

59.     Based on the Defendants' certified reporting to the U.S. Departments of Treasury and Labor (www.efast.dol.gov) for plan years 2010 to 2024, the Defendants repeatedly subordinated participants' returns and failed to ensure that their (1) plan-wide decision-making and (2) quarterly monitoring processes were based on financial factors they reasonably determined were relevant to a return and risk analysis. See 29 CFR 2550.404a-1(b).

## V.     Investment loyalty duties.

60.     In accordance with 29 C.F.R. § 2550.404a-1 ("Investment duties") the weight given to any factor *"should appropriately reflect a reasonable assessment of its*

---

[4] Department of Labor's final rule "Financial Factors in Selecting Plan Investments," issued on October 30, 2020. Specifically, it's found in 29 C.F.R. § 2550.404a-1(f)(3) — the DOL's "investment duties" regulation.
The final rule is structured as an amendment to the DOL's investment duties regulation at 29 C.F.R. § 2550.404a-1.

*impact on risk-return."* The non-subordination principle is stated explicitly: "*A fiduciary may not subordinate the interests of the participants and beneficiaries in their retirement income or financial benefits* under the plan to other objectives." See 29 C.F.R. § 2550.404a-1(c).

61. Choosing investments that incur additional daily fees—paid at 4 pm, when the stock and bond markets close—subordinates participants' returns and increases price volatility, as measured by funds' prices or net asset values (NAVs). Defendants and UBS chose the K share class even though the cheaper, identically managed K6 class (same manager and same holdings[5]) was readily available.

62. The Cook Inlet Investment Policy Statement (IPS) contains no factor or criteria based on adding costs, like extra portfolio manager's compensation or revenue-sharing, in any way, shape, or form. In fact, page 1, section C, 2, (g) stated UBS should (emphasis added):

> <u>Periodically review and evaluate the fees and costs of the Plan including investment management</u>, trust and custody, administrative services, education and consulting fees.

63. Thus, another violation occurred because Cook Inlet and UBS failed to review fees and costs, including investment management, in accordance with C, 2, (g) of the Plan's investment policy, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) (the duty to act in accordance with the documents and instruments governing the plan).

---

[5] The SEC's Office of Investor Education and Advocacy stated: Some mutual funds offer investors different types of shares, known as "classes." Each class invests in the same portfolio of securities and has the same investment objectives and policies. www.investor.gov/introduction-investing/investing-basics/glossary/mutual-fund-classes.

64. Plaintiff provides facts and circumstances, as well as evidence in this Complaint, of imprudent actions by Cook Inlet and UBS before the putative class period began to demonstrate these fiduciaries' awareness of circumstances requiring action, to show that a pattern of decision-making methodology (or lack thereof) existed for many years, and to establish context for understanding why continued action or inaction was imprudent. Some facts support findings about the fiduciary's overall monitoring processes, while others relate to the more burdensome selection investigations. Conduct predating the limitations period reinforces that historical evidence is admissible to contextualize ongoing monitoring failures, provided the Complaint articulates specific breaches and damages within the actionable timeframe.

## VI. Plaintiff's Fidelity Freedom 2055 Class K, 2065 Class D.

65. Fidelity's target date funds (Freedom (no class designator; first launched in 2003)) were chosen by the Defendants and UBS (UBS started in 2008, per Form 5500), and their first appearance was available to Plaintiff on the 2010 Form 5500. The K and K6 were launched in 2017. Cook Inlet began using the K class in plan year 2018. Cook Inlet continued using the K class until switching to the collective investment trusts in 2022. The collective investment trusts were launched in October 2022. Cook Inlet never changed to the K6 class, according to the certified reporting to the U.S. Departments of Treasury and Labor at www.efast.dol.gov.

66. The Fidelity Freedom 2055 K and 2065 K classes were Plaintiff Layman's investments. The inception date for the 2065 K6 class was 6/28/2019, so historical facts and evidence to assess the portfolio manager's skill were limited for the K and K6 classes.

23

There was potential revenue-sharing of 20 basis points (65 basis points (expense ratio) for the K class versus 45 basis points for K6) for the Defendants' retention and use of the K class. As explained above for the 2065 target date funds, the delay in switching to the cheaper, identically managed K6 share class caused an average participant to incur a lost opportunity cost of $503 over the three years from 2020 through plan year 2022.

VII. **Analysis of Fidelity Freedom 2035, the largest of the participants' holdings in the Plan.**

67. Plaintiff now evaluates the largest of the target date funds. In fact, the largest individual investment in the plan, the Fidelity Freedom 2035 (no designator), was added by the Defendants and UBS in plan year 2010. The Fidelity Freedom target date funds had only one share class until 2017. The Defendants switched to the K class in 2018 and remained in the K class until late 2022 (never exchanging to the cheaper, identically managed K6 class), when the Defendants and UBS switched to the collective trust D class. The index used for comparison was the S&P Target Allocation Series.

68. To capture the most complete set of facts and circumstances as far back as possible, Plaintiff measured return versus risk over ten years, about as far back as possible. To assess the manager's skill, the analysis compared the investment to a meaningful benchmark, spanning 2010 through plan year 2019. Over that period, the manager did not outperform the appropriate S&P Target Allocation Series benchmark. In fact, the manager lagged the benchmark by thirty-nine basis points on average over the decade (partial use of the Fidelity Freedom's oldest share class).

69. Over the ten-year period, trailing 29 CFR § 2550.404a-5 "appropriate broad-based securities market index" by thirty-nine point four basis points (0.394%) meant the portfolio manager did not cover the fund's expense ratio (0.77% per year). In fact, the IPS used by Defendants and UBS stated that they were to periodically "review and evaluate the fees and costs of the Plan including investment management . . . fees." Those fees, as stated on page 1 of the IPS, were to be monitored to ensure they were productive and resulted in the portfolio manager beating the "appropriate broad-based securities market index" (see 29 CFR § 2550.404a-5).

70. The wasted fees averaged $604,701.77 per year for all Fidelity Freedom funds from 2010 to 2017 or $4,837,614.16 over the period. Wasting the trust's money violates subsections (A), (B) and (D) of ERISA Section 404(a)(1). In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs." Uniform Prudent Investor Act (the "UPIA") §7. Courts have quoted commentary to section 7 of the Uniform Prudent Investor Act: "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs."

71. The 2035 fund was also tested against its 2035 target date peers. The Fidelity Freedom 2035 versus the target date Morningstar® 2035 peer category showed that, for the ten years prior to the limitations period's first year, the geometric mean alpha versus the peers was a paltry 0.006%. The standard deviation of the alpha was 1.52 percent, which was 26,658% more than the alpha, or almost 27 times higher. Thus, the return versus risk ratio should be at least half the risk, or 0.76% alpha. It was not.

**Comparing Fidelity target date funds to the competition.**

72. Like mutual fund share classes that use the same manager and the same holdings, collective investment trusts (CITs) share classes use the same managers and the same underlying holdings. Also, just as the Fidelity Freedom 2030 K and K6 share the same manager and the same holdings, their CIT counterparts (i.e., Fidelity Freedom 2030 Class D CIT) share the same manager and the same holdings as the Fidelity Freedom 2030 K and K6.

73. For example, the CIT class D was offered beginning late in plan year 2022, while the Fidelity Freedom 2030 was offered from 2010 to 2017, and the K class from 2018 to late plan year 2022. All Fidelity Freedom funds, across all classes, used the same managers and holdings.

*Table 2 As of 12/31/2025, Morningstar® reported the following.*

|  | Name | Manager Name |
|---|---|---|
| *CIT* | Fidelity Freedom 2030 Cmgld Pool D | Andrew J Dierdorf; Brett F. Sumsion; Cait Dourney |
| *Mutual fund* | Fidelity Freedom 2030 | Dierdorf/Sumsion/Dourney |
| *Mutual fund* | Fidelity Freedom 2030 K | Dierdorf/Sumsion/Dourney |
| *Mutual fund* | Fidelity Freedom 2030 K6 | Dierdorf/Sumsion/Dourney |

74. Plaintiff further demonstrates this relationship using standard financial metrics. For instance, the Fidelity Freedom 2065 K6 one-year Sharpe Ratio for plan year 2025 was 2.15, while Plaintiff's 2065 CIT CP D and H class Sharpe Ratios were very similar at 2.17. The B and F classes had a Sharpe Ratio of 2.15, the C and E classes had

26

2.14, and the G and J classes were slightly higher at 2.16. Over three years, the Sharpe Ratio remained consistent, differing by only 1 basis point or matching precisely.

75. Mutual funds have SEC registration costs and prospectus disclosures—CITs do not. The key structural differences are legal, not operational. CITs are bank-maintained trust funds regulated by the OCC or state banking regulators rather than the SEC. They're available only to qualified retirement plans (and certain other institutional investors), not retail investors. They don't have ticker symbols or publicly filed prospectuses.

76. The Fidelity Freedom CIT target date funds have been around for only about three to five years, so without using their mutual fund brethren, plan fiduciaries would have a hard time prudently assessing the portfolio manager's skill, fund risks, and other relevant financial factors in their investment policy. Mutual fund target date funds have been around for over a decade. The Fidelity Freedom target date funds largely began on 11/6/2003, and Vanguard's target date funds largely began on 10/27/2003.

77. The investment evaluation process must prioritize returns not in a vacuum but against risks. For example, one of the largest Plan funds by assets was the 2030 target date fund. Among the top five peers, the largest 2030 fund at $59,663M was the Vanguard Instl Trgt Retire 2030 Instl; second was the Vanguard Target Retirement 2030 Fund ($36,993M); third was the American Funds 2030 Trgt Date Retire R6 ($25,902M); fourth was the Fidelity Freedom® 2030 ($17,881M); and fifth was the T. Rowe Price Retirement 2030, with about the same assets as Fidelity's at $17,356M. After the T. Rowe Price 2030, other peers in the target-date fund space had assets of about $5,000M or less.

**Average employee tenure.**

78.     The U.S. Bureau of Labor Statistics (BLS; www.bls.gov) reported that average employee tenure had fallen to 3.9 years.[6] The short tenure of employees—less than four years—makes them acutely vulnerable to market volatility, especially losses. Mathematically, a 50% loss requires a 100% return to break even, and a 25% loss requires a 33.33% return to break even.

79.     A 25% loss can take over five years at a 5% expected rate of return just to break even before adjusting for inflation. Since December 29, 1933, the US T-Bill 90-Day has provided an average annual yield of 3.36%, while the Dow Jones Industrial Average has grown at a rate of 5.28% per year since January 2, 1900 (as of December 31, 2024). Looking further back, the US stock market has offered roughly 4.8% per year in price appreciation since 1871 (according to https://themeasureofaplan.com/us-stock-market-returns-1870s-to-present/).

80.     Adjusted for inflation, it could take participants seven or more years to recover from a 25% loss, whether they have a job or not. Good or bad luck does not excuse imprudent processes. Sharpe Ratio measurements are common financial factors in investment policies and quarterly monitoring and reporting. The Sortino Ratio is a better version of the Sharpe Ratio because it penalizes only downside volatility. It is similar to the Sharpe Ratio, except it uses downside risk in the denominator instead of standard

---

[6] https://www.bls.gov/news.release/pdf/tenure.pdf

deviation (total volatility). Since upside variability is not necessarily a bad thing, the Sortino Ratio is preferable to the Sharpe Ratio.

81.     To ensure that investment selections and retention financial factors are robust enough to protect participant account balances, regardless of tenure or market gains and losses, it is prudent to rely on simple return-versus-risk math rather than an overreliance on raw returns when judging target date funds, especially since they serve as most plans' "default investment" that non-electing new hires buy for their employment duration.

**The Case for Downside-Focused Risk Management.**

82.     The core problem plan fiduciaries face is participants' lack of investment knowledge and their vulnerability to that fact. That explains why target-date funds across Cook Inlet's Plan have consistently held over 60% of total assets since 2011. Another major problem is a mismatch between market cycles and employee tenure. The average employee tenure is less than four years. Most investment policy financial factors focus on an economic cycle that is five years or more. That means potentially 100% of participants are gone before actions are taken to remove a poorly performing investment.

83.     Flawed decision-making and flawed evaluation metrics lead to flawed investment management by plan fiduciaries. Participants may choose where their wages are invested, subject to the Committee's limited menu of about 15 non-target date options from over 10,000 mutual funds in the universe.

84.     A focus on raw returns alone creates a dangerously incomplete picture, rewarding volatility in bull markets and masking underlying risk. For example, among the top five (by assets) target date fund providers, Vanguard and American Funds have been

consistent buyers of A-rated bonds, allocating 30% of their 2030 funds to them in 2022 and earlier. Fidelity used BB- and B-rated junk or speculative bonds from 2013 to 2017 and BBB-rated bonds from 2018 to 2021. Risky bonds can jeopardize principal but pay higher yields, which can pump up returns. Given the competitive nature of QDIAs and mandatory wage deferral into these types of investments, employees chasing returns only will experience 15% more loss deviations with Fidelity than with American Funds 2030 funds over that period.

85.     Many studies have shown that losses have a greater psychological and mathematical impact than equivalent gains. Therefore, a prudent process must explicitly account for and penalize the risk of loss. "The trustee also owes to the beneficiaries a duty to act with prudence-that is, to use reasonable care and skill (see § 77)-to preserve trust property. This duty includes the use of reasonable care to protect trust property from loss or damage . . .."[7]

86.     Thus, the Committee's evaluation process should shift to metrics that quantify downside risk. A consistent, prudent process beats hope when seeking an investment strategy that delivers positive returns. A target date fund that overweighted volatile equities compared to peers, for example, might look good during a bull market run but will eventually be exposed by a market correction that occurs about every five years. A disciplined, quantitative process focused on downside risk mitigation is the only defensible long-term strategy.

---

[7] Restatement of the Law (Third) Trusts, § 76, comment on Subsection (2), Ch. 15 Specific Duties of Trusteeship.

**Fidelity target date funds versus peers.**

87. Applying this return-versus-risk focus from 29 C.F.R. § 2550.404a-1 ("Investment duties") to the Defendants' Fidelity Freedom target date funds, Plaintiffs found that, over the period from 2015 to 2022 (when most of the cheaper, identically managed share classes have existed), the Fidelity Freedom funds' use of junk or speculative-quality bonds gave them an edge over peers from a return perspective.

88. Analyzing all National Bureau of Economic Research cycles from 1854 to 2020, the official table of expansions and contractions shows an average trough-to-trough cycle length of about 58.4 months and a peak-to-peak length of approximately 59.2 months, close to five years. See https://www.nber.org/research/data/us-business-cycle-expansions-and-contractions.

89. To prudently test Fidelity's use of risky bonds, Plaintiff used the 5-year rolling total returns in the numerator and the 5-year rolling loss standard deviation in the denominator. Morningstar® described Loss Standard Deviation as focusing only on the negative-return months, and Morningstar® computes the standard deviation of those losses.

90. Given that the Committee and UBS exchanged the K share class of the Fidelity Freedom funds in 2022 from Fidelity to the collective investment trust versions of the Fidelity Freedom funds, Plaintiff inferred that a thorough analysis would have occurred at one of the quarterly meetings in plan year 2022.

91. Classes of mutual funds and classes of collective investment trusts hold the same junk-bond holdings, so the return versus risk for this loss-deviation measurement are

unaffected by cost reductions under the collective investment trusts umbrella. Collective investment trusts are chosen because of a slight fee reduction sometimes available to participants, but the manager and holdings remain the same.

92. The results came in as expected, with Fidelity Freedom's risk-adjusted returns being the worst.

*Table 3 Return versus risk (loss deviation) for plan years 2015 to 2022.*

| Name | Risk adjusted return |
|---|---|
| *American Funds 2035 Target Date Fund® R-6* | 9.89 |
| ***Fidelity Freedom® 2035 Fund*** | **7.53** |
| *TIAA-CREF Lifecycle Index 2035 Fund Institutional Class* | 8.81 |
| *Vanguard Target Retirement 2035 Fund* | 8.29 |
| *T. Rowe Price Retirement 2035 Fund* | 8.45 |

## VIII. Fidelity Contrafund Analysis.

93. The Fidelity Contrafund created predictable, quantifiable harm; the record shows negative manager skill signals in the preceding decade before the first year of the limitations period (return versus risk or information ratio −0.47, geometric mean −1.3% with elevated volatility), and persistent underperformance versus the Russell 1000 Growth from 2020–2025 (−69 bps annually). The Investment Committee retained the fund despite this pattern, and the Plan absorbed an estimated $1.277 million in harm on a $13.2 million participant asset base as of 1/1/2020.

### Fidelity Contrafund's Pre-Limitations Period Skill Analysis.

94. Reported manager skill metrics prior to the first limitations year show:

Standard deviation: 2.71;
≥50% Return versus risk ratio needed: 1.36% (2.71/2);
Actual Alpha Return: negative 1.3% per year.

95. Interpretation of the data shows a negative return (alpha) and unreliable excess-return generation relative to the benchmark, with volatility (risk) not compensated by return. Using $13.2 million in assets as of 1/1/2020, the Contrafund's harm to participants equals $1,277,284.

## IX. The Hartford Dividend and Growth Fund and the Wasatch Core Growth Fund.

96. The Plaintiff has identified systemic underperformance across multiple funds, indicating a failure of fiduciary duties and decision-making processes. Analysis shows that two specific funds, the Hartford Dividend and Growth Fund and the Wasatch Core Growth Fund, consistently lagged their respective benchmarks (S&P 500 and Russell Mid Cap Growth) both before and during the limitations period. This is not a case of minor market fluctuations; the funds appear to defy the IPS financial factors, with a structural deficit. The Hartford fund has trailed by 1.63% annually for a decade, and the Wasatch fund has had a staggering 4.2% annual standard deviation of alpha from 2010 to 2019. The resulting harm to participants is quantified in the millions. The core argument is that these funds were demonstrably poor choices from the outset and should never have been included or retained in the Plan.

### Hartford Dividend and Growth Fund: Consistent Underperformance.

97. An evaluation of the Hartford Dividend and Growth Fund reveals a significant and prolonged failure to meet or beat its meaningful benchmark, the S&P 500 Index. Over the past 5 years, the Hartford fund returned 13.25%, while the S&P 500

returned 15% per year. Over the past 10 years, the Hartford fund trailed the S&P 500 by an average of 1.63% per year. Given the 1.8% standard deviation and persistent underperformance, the analysis concludes that offering a simple adage that if Hartford cannot beat them, let participants buy them—that is, if the Hartford fund's meaningful benchmark consistently beats it, why not let participants buy one of the dozens of S&P index mutual funds that cost nothing or only 4 basis points per year.

## Wasatch Core Growth Fund: High Churn (trading/turnover).

98. The Wasatch Core Growth Fund exhibited signs of a flawed investment strategy, marked by high turnover and a concentrated portfolio, resulting in severe underperformance against its 29 CFR § 2550.404a-5 "appropriate broad-based securities market index." The fund maintained a high turnover rate (36-38% from 2020-2025) and a small, concentrated number of holdings (57 stocks during the limitation period). Morningstar's best-fit index for Wasatch shifted over time, but analysis against the Russell Mid Cap Growth index (average of 348 stocks from 2020 to 2025) provides the clearest picture and a sound basis for comparison to a meaningful benchmark with similar risks, aims, rewards and characteristics.

99. From 2010 to 2019, the fund earned 0.19% more than the Russell Mid Cap Growth index, but the 4.2% standard deviation of the alpha meant it needed to return at least 2.1% or fifty percent of the risk for an acceptable return versus risk ratio (information ratio (IR)). On and after 1/1/2020, the Wasatch fund trailed its meaningful benchmark by a staggering 333 basis points per annum (3.33%) from 2020 to 2025. This sustained

underperformance resulted in a calculated loss to participants in the limitations period of $1,536,301.

**X.    Core elements of the MFS Mid Cap Growth Fund.**

100.    The 2017 addition of the MFS Mid Cap Growth fund to participants' menu was a high-variance or high-risk bet by the Defendants that never cleared a fiduciary standard of proof. Failing to prudently investigate the SEC-prospectus financial factors after adding it to the participants' menu, or keeping it on the Plan menu through the limitations period, transferred avoidable risk and cost onto those who assumed its addition to their menu meant a prudent evaluation preceded selection in 2017 and that the Defendants and UBS would thereafter conduct prudent quarterly monitoring.

101.    The Committee added the fund in 2017, and about $1M in participant wages flowed into the fund. By year-end 2024, it held $5.9M in participant assets. Prior to the limitations window (ten years through 2019), the manager's excess return versus the Russell Mid Cap Growth benchmark averaged 81 bps/year, but it came with outsized volatility and a return versus risk ratio (information ratio) of approximately 0.24—well below a prudence threshold of 0.5 or better. Testing next for persistent skill by the variance of the outperformance, Plaintiff flipped the return versus risk over. To attain 95% confidence that the portfolio manager possessed skill, the Defendants and UBS must monitor the MFS Mid Cap Growth fund for 68 years.

102.    The Defendants failed to prudently investigate the fund's financial performance and retained the MFS fund. Later, the MFS fund underperformed its meaningful benchmark by 287 basis points per year (8.13% annual rate from 2020 to 2025,

35

whereas the 29 CFR § 2550.404a-5 benchmark, the Russell index, returned 11% annually). Thus, Participants' saved wages lost $978,000 from the beginning of the 2020 plan year.

**The Defendants provided Plaintiff and participants with inaccurate 29 CFR § 2550.404a-5 return-versus-risk information.**

103. Participants were left to evaluate their investment choices using the Defendants' annual 29 CFR § 2550.404a-5 "Fiduciary requirements for disclosure in participant-directed individual account plans" disclosures, which contained inaccurate and misleading information. The MFS Midcap fund's website and Morningstar® have shown style box six, mid growth style, from 2013 (the first year of mandatory disclosures) through 2025. MFS lists the benchmark as the Russell Midcap Growth Index in the image taken from their site.

*Figure 1 https://www.mfs.com/en-us/individual-investor/product-strategies/mutual-funds/OTCKX-mid-cap-growth-fund-share-R6.html#tab-overview*

## Fund Information

| | |
|---|---|
| Fund Commencement | 12/01/1993 |
| Net Assets ($ M) As of 01/31/26 | $13873.84 |
| Fiscal Year End | AUGUST |
| Benchmark ❓ | Russell Midcap® Growth Index |

104. The MFS Mid Cap Growth fund was added in 2017 by the Defendants and UBS, and participants contributed about $1 million of their wages to this fund. A document provided to Plaintiff upon request, under 29 CFR § 2550.404a-5, dated May 12, 2025

(covering data as of the end of plan year 2024), was titled "Required Disclosure Information Cook Inlet Region 401K Retirement Plan."

105. Page 10 of 21 of the document states that the MFS Mid Cap Growth Fund is benchmarked against the Russell 3000 index. The figure below is taken directly from the Plaintiff's notice.

*Figure 2 Defendants required disclosure to participants indicating the wrong comparator index (Russell 3000 index).*

| Investment Name Benchmark(s) | Average Annual Total Return as of 12/31/2024 | | | |
| --- | --- | --- | --- | --- |
| | 1 Year | 5 Year | 10 Year (if less, since Inception*) | Inception Date |
| MFS Mid Cap Growth Fund Class R6 | 14.79% | 9.17% | 11.60% | 12/01/1993 |
| Russell 3000 | 23.81% | 13.86% | 12.55% | |

106. However, Plaintiff saw the SEC prospectus, which, on page 3 of 5 under the heading "Investment Objective and Policy," stated the fund's objective (emphasis added),

> MFS (Massachusetts Financial Services Company, the fund's investment adviser) normally invests at least <u>80% of the fund's net assets in issuers with medium market capitalizations</u>. MFS generally defines medium market capitalization issuers as issuers with market capitalizations *<u>similar to those of issuers included in the Russell Midcap® Growth Index</u>* (the "Index") . . ..[8]

107. But given the massive lag between the MFS fund and the Russell 3000 index shown in the figure above, over every period (1-, 5-, and 10-year periods), Plaintiff inferred that the 404a-5 disclosures' "author," Cook Inlet, would have been shocked by the lagging

---

[8] https://www.sec.gov/Archives/edgar/data/63068/000091293818000391/otcsumpro.htm

numbers. The red flags should frighten most plan fiduciaries and prompt a deep dive into their accuracy and authenticity. Likely, the same errors in the 2024 document were present in earlier plan years.

108. Plaintiff further analyzed the facts and circumstances surrounding the initial inclusion of this MFS fund (plan year 2017). That analysis revealed that from 2014 to 2016, the MFS fund underperformed the Russell 3000 benchmark by 2.63% per year. Over the prior five plan years, from 2012 to 2016, the MFS fund averaged a loss of 0.84% per year relative to the Russell 3000 benchmark.

### Advancing the MFS Mid Cap Growth fund's facts and circumstances analysis of the pre-limitations period.

109. During the first year of the limitations period, the facts and circumstances regarding the Defendants' MFS Mid Cap Growth were as follows. For the ten years from 2010 to 2019, the mean alpha was 1.74% per year, but because the alpha's standard deviation was 373% higher, the return versus risk ratio was not an acceptable 0.5 but instead about half that, at 0.27. The standard deviation was 6.5, meaning that the return versus risk needed to be 3.25% and not 1.74%.

110. To establish with high confidence that the 1.74% alpha would be consistent, Plaintiff inverted the return-versus-risk ratio to show that Defendants and UBS would need to monitor the MFS Mid Cap Growth fund for 56 years to determine that the fund's portfolio manager was in fact skilled. Thus, prudent plan fiduciaries would have immediately removed the MFS fund at the start of the putative class period.

111.    Given that the Defendants and UBS kept the MFS fund despite the Russell 3000 discrepancy, Plaintiff analyzed the facts and circumstances from 2020 to 2025 and found that the MFS earned 8.1% per year, while the Russell 3000 earned 14.4% per year. Thus, the $3,584,029 of participants' dollars present in the fund on 1/1/2020 grew by $2,314,235 less in the MFS fund than in the Russell 3000 index. The harm was the $2.3M lag that could have been obtained if participants had invested in a Russell 3000 index mutual fund.

**XI.    UBS, the Defendants' chosen investment adviser fiduciary, was detrimental to participants and was excessively compensated by all participants with an account balance from plan year 2009 to 2024.**

112.    The Plan's fiduciary advisor, UBS, aided the Committee and Cook Inlet in selecting and retaining high-risk, high-cost investments for the Plan, constituting a repeated prohibited transaction under ERISA § 406(a)(1)(C), which bars a fiduciary from causing a plan to engage in a transaction that constitutes the furnishing of services between the plan and a party in interest. In *Cunningham v. Cornell University*, 145 S. Ct. 1020 (2025), the Supreme Court unanimously held that to state a claim under ERISA § 406, plaintiffs need only allege the elements contained in § 406 itself, and that the exemptions set forth in § 408 are affirmative defenses that the defendant must plead and prove.

113.    Plaintiff claims that UBS, acting as a fiduciary and interested party, led the Plan to engage in transactions providing investment services. These transactions allegedly caused the Plan to incur excessive costs and risks due to UBS's imprudent choices in selecting and holding investments for more than ten years.

114.    The Defendants were "authorized to incur an expense," but they are under "a duty to exercise such care and skill as a man of ordinary prudence would exercise in incurring the expense." Although the Defendants may properly incur expenses in employing agents, they are "under a duty not to incur a greater expense than is reasonable" and are "under a duty to use care in the selection of agents and in determining the necessity of the agents."[9]

115.    UBS was detrimental to the Cook Inlet Plan's participants because its role was to advise the Cook Inlet Plan Committee at the Plan level to ensure a single focus on participants' interests. UBS recklessly assisted the Committee in selecting and retaining imprudent investment options, and in continuing breaches in monitoring funds and violations of the Plan's funding and investment policies. UBS did not benefit participants and was therefore unnecessary for the Plan's operation. UBS's compensation was detrimental to the Plan and Trust, harming all participants' accounts in violation of the Plan document's anti-alienation provisions and ERISA's prohibited transaction rules.

116.    Setting aside whether UBS was necessary for the Cook Inlet Plan's operation, UBS was unreasonably compensated in every plan year since its hire date. That is because advisor fees have consistently run at $300 per hour for an advisory firm's most valuable and experienced principals. In fact, the Fee Benchmarker® (Advisor Fee Almanac, 6th Edition, 2017), page 15, under "Fee & Services Trends Summary," stated "[t]he average hourly rate increased less than 1% to $306 per hour."

---

[9]Restatement of the Law of Trusts (Third), section 90, chapter 17 ("Investment of Trust Funds - The Prudent Investor Rule"), comment m, page 384, see § 174.

117. The Capital Group, one of the largest mutual fund families in the United States, released a 2024 survey of 84 investment advisory firms that generate at least 50% of revenue from retirement or a dedicated retirement plan business. The survey found the average amount of time financial professionals spend on plans annually. For plans the size of Cook Inlet's Plan, advisors spend an average of 53 hours per year.[10]

118. Plaintiffs note that UBS's pay, on average, was many times higher than the 2024 Capital Group survey of 84 firms. Financial professionals typically spend 53 hours a year at $306 per hour, for a total of $16,218 per year. Plaintiff was denied access to the Committee's service agreements, meeting minutes, quarterly monitoring reports, and other critical items, leaving Defendants in a superior position and requiring a moderation of Plaintiff's claims.

119. UBS pay was authorized under its agreement with Cook Inlet, and, per the certified reporting to the DOL, all dollars paid to UBS were deducted from every participant with an account balance. UBS's average compensation during the putative class period was $49,700. Given that UBS likely spent about 50 hours servicing Cook Inlet's Plan, its pay should have been about $300 per 50 hours, or $15,000. However, it deducted over three times that amount from participants over plan years 2020 to 2024.

120. Full-time employees (2,000 working hours per year) based on 2025-2026 data at Salary.com averaged about $50,000 per year ("Related industry jobs in the region, such as oil rig positions, have an average annual pay around $50,825."). UBS made the

---

[10] https://www.capitalgroup.com/advisor/insights/articles/ir-retirement-plan-service-by-the-numbers.html

same amount but worked about 1,500 hours less and could conduct almost all interactions via Zoom, using Adobe electronic file dissemination—all costs for these materials were near zero dollars since they are spread across all plans UBS services.

*Figure 3 UBS compensation was paid from participants' assets per Cook Inlet Forms 5500.*

| 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|
| **$34,252** | $38,765 | $51,017 | $45,000 | $63,500 | $45,000 | $45,000 | $45,000 | $50,000 |

121. Flat-dollar fees paid from the Plan (and participants) in 2019, 2021, and 2022 through 2024 indicate that UBS did not directly track its true costs of servicing the Cook Inlet Region 401(k) Retirement Plan. Instead, it appears to have set its own compensation. A fiduciary adviser generally cannot freely set its own compensation from plan assets; it must either avoid discretionary self-dealing altogether or fit within a prohibited-transaction exemption, and in all cases the compensation must be reasonable. Paying a fiduciary (or other "party in interest") from plan assets is a prohibited transaction under ERISA § 406(a) and § 406(b) unless an exemption applies.

122. The primary statutory exemption for service provider compensation is ERISA § 408(b)(2), which permits payment of "reasonable compensation" for necessary services under a reasonable contract or arrangement. Plan fiduciaries must assess whether the services and the total compensation are reasonable, not merely disclosed.

123. When a fiduciary like UBS uses its own discretion to determine the compensation it will receive from plan assets, the DOL has long viewed that as self-dealing under § 406(b), regardless of whether the amount is objectively reasonable.

124. ERISA authorizes any plan participant or beneficiary to bring an action individually on behalf of the plan for appropriate relief under 29 U.S.C. § 1109(a) for a plan fiduciary's breach of duty, including all losses resulting from such breach and such other equitable or remedial relief the court may deem appropriate. *See* 29 U.S.C. § 1132(a)(2).

125. Acting in this representative capacity, and as an alternative to numerous direct individual actions brought by participants on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiff seeks to certify this action on behalf of all participants and beneficiaries of the Plan.

126. Plaintiff seeks to certify the following class, and to be appointed as the representative on behalf of the following class:

> All participants and beneficiaries in the Cook Inlet Retirement Plan at any time during the Class Period. Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case.

127. The Class Period is defined as six years prior to the filing of this Complaint and continuing through the date of judgment in this action.

128. The Class includes thousands of members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

129. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owe fiduciary duties to the Plan and

took the acts and omissions alleged as to the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to:

    a.  Whether Defendants are fiduciaries of the Plan;

    b.  Whether Defendants failed and continue to fail to discharge their duties with respect to operating the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

    c.  Whether Defendants breached their fiduciary duties under ERISA by selecting and/or retaining the disputed funds;

    d.  Whether Defendants engaged in prohibited transactions by allowing revenue-sharing to benefit party-in-interest and reduction of Plan assets for payments to fiduciary advisers (UBS);

    e.  Whether the Plan suffered losses from Defendants' breach(es);

    f.  The manner in which the Plan's losses can be calculated; and

    g.  What equitable relief, if any, is appropriate for Defendants' breach(es).

130. Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3) because Plaintiff was a Plan participant during the time period at issue and the participants in the Plan were harmed by Defendant's fiduciary misconduct in the same manner.

131. Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a Plan participant in the Plan during the Class period,

has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent counsel to represent the Class.

132. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants concerning their discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

133. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

134. Plaintiff's attorneys are experienced in complex employment class actions, including ERISA litigation, and will adequately represent the Class.

## COUNT I: Breach of Fiduciary Duties
### (against all Defendants)

135. Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

136. Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1). At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

137. Defendants' conduct, as set forth above, violates their fiduciary duties under Section 404(a)(1) (B) of ERISA, 29 U.S.C. § 1104(a)(1)(B). Defendants were in obligation to discharge its duties to the Plan and participants with the care, skill, prudence, and diligence of a competent investment fiduciary charged with responsibility for investing millions of dollars of retirement savings on behalf of thousands of investors. ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

138. Defendants, as fiduciaries of the Plan, are responsible for selecting and maintaining prudent investment options and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

139. During the Class Period, Defendants had a fiduciary duty to manage the assets of the Plan prudently and act with the care, skill, diligence, and prudence required by ERISA. Common law and ERISA's duty of prudence required Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1.

Case 3:26-cv-00084-ACP    Document 1    Filed 02/23/26    Page 46 of 56

140. In accordance with 29 C.F.R. § 2550.404a-1 "Investment loyalty duties," gave weight to selecting and retaining revenue-sharing funds which was not a financial factor that "should appropriately reflect a reasonable assessment of its impact on risk-return." The non-subordination principle is stated explicitly: "A fiduciary may not subordinate the interests of the participants and beneficiaries in their retirement income or financial benefits under the plan to other objectives." See 29 C.F.R. § 2550.404a-1(c).

141. Choosing investments because they have extra fees taken daily from Plan participants (that can later be received by the Defendants' designated custodian (per the service agreements signed by the Plan's named fiduciary)) and directed by the Defendants to be paid to a Plan party-in-interest (a firm that was also chosen by the Defendants, Fidelity), violated the terms of the Plan's funding policy and investment policy in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D): the duty to act in accordance with the documents and instruments governing the plan.

142. Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during the Class Period, Defendants failed to have a proper system of review in place to ensure, among other things, that: (a) their selection and retention of investment options were prudent; and (b) Plan expenses were reasonable and necessary.

143. During the Class Period, Defendants breached their fiduciary duties of prudence to Plan participants, including to Plaintiff, by keeping and failing to remove imprudent investments, and failing to act with the care, skill, diligence, and prudence required by ERISA.

144. Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess before and during the Class Period whether the disputed funds were prudent choices for the participants and to remove imprudent investment options regardless of how long those investments had been in the Plan.

145. As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, Plaintiff and Plan participants suffered tens of million dollars in unreasonable and unnecessary monetary losses.

146. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breach of fiduciary duty alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2). Total losses to the Plan will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been available to the Plan's participants to date.

### COUNT II: Failure to Adequately Monitor Other Fiduciaries
### (Against all Defendants)

147. Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

148. At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority

or control over the administration and/or management of the Plan or disposition of the Plan's assets.

149. Defendants had the authority to appoint and remove members or individuals responsible for Plan investment management on the Administrative Committee and was aware that these fiduciaries had critical responsibilities for the Plan.

150. In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan investment management on the Administrative Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

151. Defendants failed to only act with the exclusive purpose of providing benefits to participants by allowing revenue share, unnecessary costs, and excessive costs diminish Plan participants retirement funds.

152. Defendants failed to defray expenses by allowing revenue sharing, unnecessary costs, and excessive costs diminish Plan participants retirement funds.

153. Defendants failed to act with the exclusive purpose of providing benefits to participants by choosing economically unfavorable options in exchange for revenue share benefits that benefited Defendants and third parties at the expense of the participants.

154. Defendants had a duty to ensure that the individuals responsible for Plan investment management on the Administrative Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information;

maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

155. Defendants breached their duty to monitor individuals responsible for Plan investment management, by, among other things:

a. Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses by maintaining the imprudent Funds during the Class Period;

b. Failing to monitor the process by which Plan Funds were evaluated, failing to investigate the suitability of managed Funds based on Plan demographics and failing to investigate the availability of alternative, prudent funds; and

c. Failing to remove individuals responsible for Plan investment management whose performance was inadequate in that they continued to maintain imprudently managed Funds, all to the detriment of the Plan and Plan participants' retirement savings.

d. Failing to ensure that the monitored fiduciaries had a conflict-free process in place for evaluating and ensuring that investment options were selected solely in the interests of the Plan's participants and beneficiaries and did not constitute prohibited transactions.

156. As a result of Defendants' foregoing breaches of the duty to monitor, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses amounting to tens of millions of dollars. Had Defendants discharged their fiduciary duties

prudently as described above, the losses suffered by the Plan would have been minimized or avoided.

157.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable for restoring to the Plan all losses caused by their failure to adequately monitor individuals responsible for Plan investment management on the Administrative Committee. In addition, Plaintiff and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**COUNT III: Prohibited Transactions**

**(Against All Defendants)**

158.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

159.     ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), requires a plan fiduciary to refrain from engaging in a transaction, if he knows or should know that the transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest.

160.     ERISA § 406(a), 29 U.S.C. § 1106(b), provides, in pertinent part, that a fiduciary with respect to a plan shall not:

a.   deal with the assets of the plan in his own interest or for his own account, or

b.   in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

51

c. receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

161. By exercising authority and/or control with respect to the management of the Plan and their assets; and/or by rendering investment advice or by having authority or responsibility to render investment advice to the Plan; and/or by being designated in the governing document of the Plan as a fiduciary within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), Defendants are fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), and ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

162. As the sponsor, administrator, recordkeeper, and provider of investment management and other services to the Plan, the Defendants are a party in interest to the Plan within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14), from which they receive compensation.

163. By maintaining the revenue-sharing, costly and risky managed funds in the Plan, Defendants directly or indirectly furnished services to the Plan and received compensation.

164. By maintaining the revenue-sharing classes in the Plan, Defendants dealt with the assets of the Plan in their own interest and received consideration for their own personal account in connection with a transaction involving the assets of the Plan.

165. The prohibited transactions that Defendants engaged in are as follows:

a. causing the Plan to engage in transactions that they know or should know constitute direct or indirect transfers of the Plan's assets to, or use of the

52

Plans' assets by or for the benefit of, parties in interest, in violation of ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1);

b. causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan dealt with the assets of the Plan in their own interest or for their own account, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1);

c. causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan, in their individual or in any other capacity, acted on behalf of a party whose interests were adverse to the interests of the Plan or the interests of the Plan's participants or beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2);

d. causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan received consideration for their own personal account from any party dealing with the Plan in connection with a transaction involving the assets of the Plan, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

166. As both a fiduciary and a party in interest, the Defendants are liable for these violations of ERISA § 406(b)(1), (2), and (3), 29 U.S.C. § 1106(b)(1), (2), and (3), pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

167. As a direct and proximate result of the Defendants' breaches of fiduciary duties, the Plan has suffered millions of dollars of damages which continue to accrue and

for which the Defendants are jointly and severally liable pursuant to ERISA § 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and 1109(a).

168. Each of the Defendants is liable to make good to the Plans as a whole the losses resulting from the aforementioned breaches and to restore to the Plans any profits resulting from the breaches of fiduciary duties alleged in this Count. The Defendants are subject to other Plan-wide equitable or remedial relief as appropriate.

169. Each Defendant also participated in the breach of the other Defendants, knowing that such acts were a breach, and/or enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, and/or knew of the breach by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the Plan-wide losses caused by the breach of its co-fiduciary duties under ERISA § 405(a), 29 U.S.C. § 1105(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Layman on behalf of himself, the Class, and the Plan, prays the Court for a judgment against the Defendants as follows:

    a. find and adjudge that Defendants have breached their fiduciary duties as described above;

    b. find and adjudge that Defendants are personally liable to make good to the Plan the losses to the Plan as a whole resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position they would have occupied but for the breaches of fiduciary duties;

c. order the Defendants to make good to the Plans as a whole the losses resulting from each breach of fiduciary duty and to restore to the Plans any profits resulting from each breach of fiduciary duty;

d. find and adjudge that the Defendants are liable to the Plan for appropriate Plan-wide equitable relief, including but not limited to restitution and disgorgement;

e. determine the method by which losses to the Plan under ERISA § 409(a), 29 U.S.C. § 1109(a), should be calculated;

f. order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under ERISA § 409(a), 29 U.S.C. § 1109(a);

g. impose surcharges against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

h. order the proceeds of any Plan-wide recovery for the Plan to be allocated to the accounts of members of the Class to make them whole for any injury that they have suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

i. certify the Class, appoint the Plaintiff as class representative;

j. award to the Plaintiff and the Class their attorney's fees and costs under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), and the common fund doctrine;

k. order Defendants to pay interest to the extent allowed by law; and

l.   grant such other equitable or remedial relief as the Court deems proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

This the 23rd day of February, 2026.

Respectfully submitted,

*s/ Joshua Cooley*

Joshua B. Cooley (AK#1409065)
Katherine Elsner (AK#1411116)
**EHRHARDT, ELSNER & COOLEY**
215 Fidalgo Ave, Suite 201
Kenai AK 99611
Phone: (907) 283-2876
Fax: (907) 283-2896
josh@907legal.com
katie@907legal.com

Gary M. Klinger*
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
Email: gklinger@milberg.com

* *Pro Hac Vice* forthcoming

*Attorneys for Plaintiff and the Proposed Class*