Joshua B. Cooley (AK#1409065)
Katherine Elsner (AK#1411116)
**EHRHARDT, ELSNER & COOLEY**
215 Fidalgo Ave, Suite 201
Kenai AK 99611
Phone: (907) 283-2876
Fax: (907) 283-2896
josh@907legal.com
katie@907legal.com

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ALASKA
### Civil Action No. 3:26-cv-00084

| | |
|---|---|
| LUKE LAYMAN, individually and as representative of a class of similarly situated participants in the COOK INLET REGION 401(k) RETIREMENT PLAN, <br><br> Plaintiff, <br><br> v. <br><br> COOK INLET REGION, INC.; CIRI BOARD OF DIRECTORS; THE CIRI RETIREMENT PLAN COMMITTEE; and JOHN AND JANE DOES 1-30 IN THEIR CAPACITIES AS FIDUCIARIES, <br><br> Defendants. | **FIRST AMENDED CLASS ACTION COMPLAINT** <br> (Jury Trial Demanded) |

1. Plaintiff Luke Layman ("Plaintiff"), by and through his undersigned attorneys, on behalf of the Cook Inlet Region 401(k) Retirement Plan, himself, and all others similarly situated, states and alleges as follows:

## INTRODUCTION

2. Cook Inlet Region, Inc. (CIRI) is a for-profit Alaska Native Regional Corporation that offers a retirement plan, the Cook Inlet Region 401(k) Retirement Plan (the "Plan"), to its employees. CIRI is the Plan's sponsor and Administrator.

3. The Plan's investment options are chosen by CIRI through the CIRI Retirement Plan Committee (the "Committee").

4. CIRI, through the CIRI Board of Directors, appointed the Committee as Plan Administrator, responsible for overseeing the Plan.

5. During the Relevant Time Period, the Committee made investment decisions with the assistance of UBS Financial Services, Inc. ("UBS"), who acts as the Plan's investment advisor. UBS started advising the Plan in 2008.

6. CIRI, the CIRI Board of Directors, the Committee, and John and Jane Does 1-30 (together, "Defendants") each serve as fiduciaries of the Plan.

7. This case involves multiple breaches of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq. ("ERISA"), by Defendants.

8. ERISA requires fiduciaries of retirement plans to closely monitor plan investments, to remove imprudent investments within a reasonable time, and to make all investment decisions solely in the interest of the plan's participants and beneficiaries. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

9. Defendants breached their fiduciary duties to the Plan, their duty of prudence under ERISA, and their other duties under ERISA by:

2

a. Failing to monitor the performance of the investment options in the Plan and remove those investments that significantly underperformed the benchmarks the investments set for themselves, particularly when compared to the risk that they posed, for several years in a row;

b. Failing to monitor the costs of the investment options in the Plan, and move assets invested in more expensive share classes of certain investment options into lower-cost but otherwise-identical classes that had been available for years, and for which the Plan qualified, despite the millions of dollars in savings that would have been realized for the Plan's participants due to such a move;

c. Utilizing a fundamentally deficient process to evaluate the performance and costs of the investments on the Plan's menu;

d. (On CIRI's part) Paying UBS, the Plan's fiduciary investment advisor, inflated sums from Plan assets during the Relevant Time Period; and/or

e. Other ways to be proven at trial.

10. As a result of these breaches in fiduciary duty, Plaintiff and the proposed class have collectively lost millions of dollars in growth and appreciation in their retirement accounts.

11. Employers who offer 401(k) plans to their employees have a duty to make sure that the Plan, including the investment options available to employees, are always in the best interest of the employees.

3

12. Defendants here blatantly failed to fulfill that duty in many ways. That makes Defendants liable to Plaintiff and other Plan participants.

13. To remedy Defendants' fiduciary breaches, as further described below, Plaintiff brings this action individually and on behalf of the Plan to obtain the relief provided under ERISA § 409, 29 U.S.C. § 1109, for losses suffered by the Plan from six years prior to the filing of his initial Complaint to the date of judgment (the "Relevant Time Period"), and for other appropriate equitable and injunctive relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

14. Courts around the country have repeatedly held that allegations of prolonged underperformance and/or sustained excess fees support a plausible inference of imprudence, without relying on hindsight.

## PARTIES

15. Plaintiff Luke Layman resides in Anchorage, Alaska, and during the Relevant Time Period he was a participant in the Plan under 29 U.S.C. § 1002(7). During the Relevant Time Period, Layman maintained investments through the Plan in the Fidelity Freedom 2055 Class K and Fidelity Freedom 2065 Class K funds, and he paid excessive management, revenue-sharing, and investment advisory fees as a result of Defendants' conduct.

16. CIRI is a for-profit Alaska corporation organized under the Alaska Native Claims Settlement Act of 1971 as one of twelve land-based Alaska Native Regional Corporations. CIRI's principal place of business is located in Anchorage, Alaska. CIRI is the largest private landowner in Southcentral Alaska and manages roughly 1.6 million acres

of subsurface estate and 529,500 acres of surface estate. CIRI is the Plan's sponsor and named Administrator, and is a fiduciary of the Plan.

17. The CIRI Board of Directors ("Board of Directors") is the governing body of CIRI, and it operates at CIRI's principal place of business in Anchorage, Alaska. The Board of Directors appointed the Committee, approved an Amended and Restated Charter for the Committee identifying its roles and responsibilities, and at all relevant times had the authority to appoint and remove members or individuals responsible for Plan investment management on the Committee. The Board of Directors is a fiduciary of the Plan.

18. The Committee is an organization within CIRI, is controlled and directed by CIRI (through the Board of Directors), and maintains its address at CIRI's principal place of business in Anchorage, Alaska. The Committee serves as Plan Administrator and is responsible for overseeing the Plan's investment options. The Committee is a fiduciary of the Plan.

19. John and Jane Does 1-30 (the "Doe Defendants") are individuals who, upon information and belief, were at relevant times members of the Committee, members of the Board of Directors, or otherwise served as fiduciaries of the Plan, whose identities are not yet fully known to Plaintiff and will be identified through discovery.

20. Defendants regularly conduct and transact business throughout this District, where Plaintiff resides and was employed by CIRI.

21. Subject matter jurisdiction over this matter is conferred upon and vested in this Court under 28 U.S.C. §§ 1331 and 1332.

22. This Court has personal jurisdiction over Defendants because Defendants regularly conduct and transact business within this District. CIRI's contacts with the forum include employing individuals like Plaintiff, who resided in this District during his employment with CIRI and continues to do so.

23. Venue is proper in this Court pursuant to 29 U.S.C. § 1132(e)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Further, Defendant CIRI may be found in this District, as it is headquartered in Anchorage, Alaska, which lies within this District.

24. This action has been brought within all applicable statutes of limitations and/or repose.

## FACTUAL ALLEGATIONS

### I. General Principles of 401(k) Plans.

25. "Defined contribution" plans such as 401(k) plans have become the primary form of retirement saving in the United States, as employer-provided "defined benefit" plans (such as pensions) have become increasingly rare.

26. Defined contribution plans do not offer a guaranteed benefit and as a result participants bear the risk of high fees and investment underperformance.

27. Participants each have an individual account, where their own contributions and those made on their behalf by their employer are allocated.

28. Participants are then free to make investments from a selection of options (the "menu") chosen by the Plan Administrator in its fiduciary capacity.

29. A Qualified Default Investment Option ("QDIA") is a default investment choice available to a plan participant who does not specify how to invest their retirement contributions.

30. QDIAs are selected by plan fiduciaries and automatically receive contributions if participants do not make investment choices; typically, a substantial portion of Plan assets is invested in the QDIA.

31. Plan fiduciaries are responsible for the prudent selection and continuous monitoring of each option on the menu, including the QDIA.

**II.     The Plan and its Fiduciaries.**

32. CIRI is a for-profit Alaska Native Regional Corporation organized under the Alaska Native Claims Settlement Act of 1971 and headquartered in Anchorage, Alaska. CIRI is the largest private landowner in Southcentral Alaska, with diverse investments spanning 45 states and including sectors such as renewable energy and oil and gas leasing.

33. CIRI offers its employees the chance to participate in and contribute their wages to a defined contribution retirement plan called the Cook Inlet Region 401(k) Retirement Plan (the "Plan").

34. The Plan qualifies as a "large plan" with assets between $200 million and $1 billion. From 2020 through 2024, the Plan's assets grew from $375,000,000 to $577,734,000. At the time of its most recent Form 5500 filing, the Plan had 5,327 active participants.

7

35. Fidelity Management Trust Company ("Fidelity MTC") serves as the Plan's trustee, recordkeeper, and custodian. Each participant holds a bookkeeping or record-keeping account with Fidelity MTC, which is credited with contributions and allocations, and charged for service providers' compensation payments, including those made to UBS and Fidelity MTC itself.

36. CIRI has enacted an Investment Policy ("IPS") to guide Plan fiduciaries in selecting, monitoring, and terminating investment funds for the Plan. According to the IPS, CIRI is the Plan's sponsor and Administrator.

37. According to the IPS, CIRI, through the Board of Directors, has delegated its authority and responsibility as Administrator of the Plan to the Committee. The Board of Directors approved an Amended and Restated Charter for the Committee that identifies the roles and responsibilities of the Committee.

38. The IPS states that the Committee has authority "to select, monitor and terminate the . . . main investment options offered under the Plan[;]" responsibility for "selecting and modifying the scope of investments offered under a brokerage window (such as mutual funds, as opposed to individual mutual funds)[;]" and responsibility for "selecting, monitoring, and terminating investment advisors."

39. The Committee engaged an investment advisor, UBS, to assist the Committee in the monitoring of the Plan's investments. Per the IPS, UBS's duties include, but are not limited to: (a) researching and assisting in selecting investment funds; (b) conducting due diligence monitoring of the investment funds and reporting to the Committee; (c) notifying the Committee of any issue that may impact the investment of

8

Plan assets; (d) assisting the Committee in developing and reviewing investment strategies; (e) providing reports on the performance of the investment funds on a regular basis; and (f) periodically reviewing and evaluating the fees and costs of the Plan including investment management, trust and custody, administrative services, education and consulting fees.

40. The IPS sets the parameters of the Committee's monitoring of the Plan's investments. Specifically, it requires that each quarter, the Committee will review the "[p]erformance and risk levels over various periods in light of the stated policies and objectives[;]" and "[d]evelopments within the economy and the securities markets, and their potential effect on investment strategy, asset allocation, and fund performance." The IPS also requires the Committee to review the fees charged by the various investments on a periodic basis. The IPS moreover requires the Committee to review the fees charged by UBS on a periodic basis.

41. Under ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), Plaintiff requested access to certain key documents under which the Plan was established and/or operated, to which he is entitled. Defendants denied Plaintiff access to the Committee's service agreements, meeting minutes, and quarterly monitoring reports, the Amended and Restated Charter mentioned in the IPS, and the Funding Policy.

### III. Fiduciary Duties Under ERISA.

42. ERISA imposes strict obligations on fiduciaries, including the duty of prudence, the duty of loyalty, the duty to adhere to plan documents, and the requirement to

9

refrain from any prohibited transactions. These obligations apply to all fiduciary acts, including the monitoring and retention of investment options for the Plan.

43. ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). Even in a defined contribution plan in which participants choose their investments, plan fiduciaries have the duty to rigorously and independently evaluate each of the plan's investment choices to determine which may be prudently included in the plan's menu of options.

44. As part of their fiduciary duties, fiduciaries have "a continuing duty to monitor [ ] investments and remove imprudent ones" that exists "separate and apart from the [fiduciaries'] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). If an investment is or becomes imprudent, fiduciaries "must dispose of it within a reasonable time." *Id.* at 530. Breaching this duty to monitor the investments and remove imprudent ones is a basis on which to allege the breach of the fiduciary duty of prudence. *Id.*

45. Defendants breached their fiduciary duties of prudence to the Plan by (1) failing to monitor the Plan's investments and remove certain investment options in the Plan, despite their glaring underperformance, and by (2) failing to move Plan assets into cheaper but otherwise identical share classes that were available and for which the Plan qualified.

46. ERISA fiduciaries who are empowered to appoint and remove other plan fiduciaries have the duty to monitor them and to ensure that their appointees' performance is in compliance with the terms of the plan and statutory standards and otherwise satisfies the needs of the plan.

47. Under ERISA § 405(a), 29 U.S.C. § 1105(a), a fiduciary may also breach his duties to the Plan if (1) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of another fiduciary, knowing that such act or omission is a breach; (2) his breach of duty enables another fiduciary to commit a breach; or (3) he has knowledge of another fiduciary's breach and does not make reasonable efforts under the circumstances to remedy the breach.

48. The general duties of loyalty and prudence imposed by ERISA § 404, 29 U.S.C. § 1104, are supplemented by a detailed list of transactions that are expressly prohibited by ERISA § 406, 29 U.S.C. § 1106, and are considered per se violations because they entail a high potential for abuse.

49. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), states that with respect to a plan, a fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect ... (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or a] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]"

50. ERISA § 3(14), 29 U.S.C. § 1002(14), provides an expansive definition of "party in interest." This term includes the Plan's fiduciaries, as well as certain non-

fiduciaries who nevertheless by virtue of their relationship to the Plan should not receive any of its assets, or other compensation through use of the assets of the Plan.

51. By failing to notice or appreciate that the Committee had not fulfilled its duties to monitor the performance and costs of the Plan's investments, CIRI and the CIRI Board of Directors breached their duty to monitor their appointees.

52. Alternatively, because they knew that the Committee had not fulfilled its duties to monitor the performance and costs of the Plan's investments, CIRI and the CIRI Board of Directors are directly liable for the Committee's breaches of duty.

53. Defendant CIRI also breached its fiduciary duties to the Plan by engaging in prohibited transactions by directing UBS's compensation to be taken from Plan assets during the Relevant Time Period, and by maintaining revenue-sharing share classes that transferred Plan assets to Fidelity, a party in interest.

**IV.     The Key Underperforming Funds and Costly Share Classes.**

54. There are three investment options on the Plan's menu that best illustrate Defendants' abdication of their responsibilities under ERISA: (1) the Fidelity Freedom Target Date Funds (the "TDFs"); (2) the Fidelity Contrafund; and (3) the MFS Mid Cap Growth Fund. Collectively, Plaintiff refers to these challenged investment options as the "Funds."

55. One of the Funds, the Fidelity TDFs, was offered on the Plan's menu as a mutual fund in 2020–2021, and then as a Collective Investment Trust (CIT) from 2022 onwards.

56. CITs are very similar to mutual funds.[1] In fact, many mutual funds have CIT counterparts that are nearly identical with respect to their underlying holdings and performance. CITs and their mutual fund counterparts are also typically managed by the same managers, and employ the same objectives, strategies, and risk profiles.

57. Despite these similarities, CITs and mutual funds are subject to very different regulatory systems. To briefly summarize, CITs are a relatively new investment vehicle and are subject to less regulation than traditional mutual funds are. For example, CITs are not required to publish their returns, expenses, or other key information which mutual funds are required by the SEC to provide. CITs are also only available to qualified institutional investors such as retirement plans; they are not available to individual retail investors.

58. Due to the lack of mandated transparency for CITs, performance data is not regularly published in mandatory annual reports, and typically such information is not freely shared beyond the CITs' investors (such as the Plan). Nevertheless, because many CITs have mutual fund counterparts, and because the holdings and performance of CITs and their mutual fund counterparts are statistically nearly identical, a CIT's performance can be demonstrated with great statistical accuracy by looking at the performance of its mutual fund counterpart.

59. The Funds are actively managed. In other words, managers make changes to the Funds' allocations of stocks, bonds, and cash over time, with the stated goal of

---

[1] For this reason, and for ease of reading, Plaintiff herein refers generally to investment vehicles (including both CITs and mutual funds) as "funds" unless the differences between a mutual fund and a CIT are relevant in that context.

outperforming a "benchmark," which is generally an index of market performance such as the S&P 500, Russell 1000, etc.  These "active" funds are sometimes contrasted with "passive" index funds, which seek to track a market index as closely as possible by investing in the index's investments, and which involve little discretion on the part of the fund's managers.

60.     Every actively-managed mutual fund regulated by the SEC is required to set a benchmark, and to disclose to its shareholders in its annual and semi-annual reports how the fund performed in relation to that benchmark.  If the mutual fund decides to switch to a different benchmark, it must provide an explanation for the change to its shareholders and provide them with data showing the relative performance of the old and new benchmarks.  CITs are not subject to these requirements, but they still generally set benchmarks voluntarily.

61.     Nearly every active fund charges investors a fee in exchange for its managers' efforts to beat the designated benchmark.  Generally, this fee is a percentage of the assets under management, known as the "expense ratio."  These expenses are deducted from the fund's investment returns and reflected in net investment performance figures, reducing the year's returns or increasing its losses.  The expense ratios of active funds are generally higher than those of passive funds.

62.     Actively managed funds are not *per se* inappropriate to include on a plan's menu.  However, because active funds come with more expense and (generally) higher risk compared to passive index funds, prudent fiduciaries should—and must—compare actively managed funds to passively managed index funds to determine whether a plan is getting

the additional return to justify the increased expense and risk of the active investment. If the safer, cheaper index fund is repeatedly outperforming the more risky, more expensive active fund, a prudent fiduciary will notice, and act promptly to remove the needlessly risky and expensive option.

63. Because retirement funds are normally a long-term investment, very small differences in an investment's return or costs can have surprisingly large impacts when compounded for decades. For example, the U.S. Department of Labor estimates that just a 1% dip in the growth rate of an investment (or the imposition of an additional 1% in fees), compounded over a 35-year period, results in a 28% reduction in retirement assets when a participant retires. For example, if a participant invested $100,000 at Year 0 and made no further contributions, assuming a consistent 7% annual growth rate, 35 years later, the assets would be worth $1,067,658.15. If that growth rate were dragged down to 6%, whether by the imposition of an additional 1% in fees or by underperformance, the participant would be left with only $768,608.68 (almost exactly 28% less).

64. Thus, prudent fiduciaries cannot disregard even small differences in the growth rate of certain funds compared to their indices, or in the expense ratios of one fund versus another. A few basis points—hundredths of a percentage point—today can grow or shrink the Plan's assets by millions or tens of millions of dollars over time.

65. Many funds offer multiple "share classes." Share classes in a single fund are targeted at different investors. These share classes generally hold the same components, use the same managers, and follow the same investment objectives and policies. The key difference between them is in the amount and structure of their fees and expenses, which

15

typically depend on the amount of money a given plan has available to invest: larger accounts and those making longer-term investments are incentivized to invest in a fund through lower-cost share classes.[2]

66. Institutional investors, such as 401(k) plans, have access to an exclusive tier of share classes: "Institutional" shares, which are variably labeled with the letters I, R, N, X, or Y. These share classes typically offer the lowest expense ratios available and "invariably garner the best returns."[3]

67. Some share classes' expense ratios include a portion that is designated as "revenue-sharing." Revenue-sharing passes certain costs through to participants' accounts as a percentage of the assets under management *every day*, costs that would otherwise be either borne by the plan sponsor or charged to participants' accounts as a flat fee. Some funds credit back some or all of this amount periodically. But even if 100% of the amount paid up-front is credited back a month, a quarter, or a year later, the participant has missed out on the interest and gains generated from that amount in the interim. For the Plan to come out ahead in a revenue-sharing arrangement, the eventual credit must therefore not only offset the up-front difference in fees but also the lost performance between the fee being charged and credited back. This is rarely true, and was not true here. Thus, for the

---

[2] In other scenarios not applicable here, share classes have other differences. For example, share classes of a stock in an individual company may come with different attendant rights and voting power with respect to shareholder votes.

[3] Troy Segal, *Understanding Share Classes: Types, Rights, and Key Features Explained*, INVESTOPEDIA (Oct. 3, 2025), https://www.investopedia.com/terms/s/share_class.asp.

Plan, revenue-sharing ultimately represents a cost borne by its participants that directly reduces the balance and growth of their accounts.

68.     The SEC Office of Compliance Inspections and Examinations has stated that an investment fiduciary "has failed to uphold its fiduciary duty when it causes a client to purchase a more expensive share class of a fund when a less expensive class of that fund is available."[4]

### A.     Fidelity Freedom Target Date Funds.

69.     The Fidelity Freedom Target Date Funds ("Fidelity TDFs") have been offered as investment options on the Plan's menu since at least plan year 2003.

70.     Target date funds like the Fidelity TDFs typically include multiple "vintages" targeted at different projected retirement years in five-year intervals, including the 2055 and 2065 vintages in which Plaintiff was invested.

71.     Target date funds are designed to provide a comprehensive retirement strategy by investing in a mix of assets that becomes more conservative as the projected retirement year approaches.  Over time, later-dated vintages are added to accommodate younger workers entering the workforce, and earlier-dated vintages are phased out in favor of a catch-all, the more conservative "income" vintage.  During the Relevant Time Period, the Plan offered the 2005 through 2065 vintages, as well as the Income vintage.

---

[4] *OCIE's 2016 Share Class Initiative*, S.E.C. OFFICE OF COMPLIANCE INSPECTIONS AND EXAMINATIONS (July 13, 2016), https://www.sec.gov/files/ocie-risk-alert-2016-share-class-initiative.pdf.

72. Some target date funds aim to manage invested monies "to" retirement, freezing the mix of investments at the target date, while others aim to manage invested monies "through" retirement, continuing to rebalance the mix of investments after the target date has passed. The Fidelity TDFs employ a "through" glide path.

73. Because Defendants selected the TDFs as the Plan's QDIA, any participant who did not select a specific investment was invested in the TDFs by default. It is therefore unsurprising that these funds held over 60% of the total Plan assets throughout the Relevant Time Period.

74. All vintages of the Fidelity Freedom Target Date Funds offer multiple share classes, and each class is managed by the same portfolio managers and holds the same underlying investments.

75. The managers of the Fidelity TDFs selected the S&P 500 as the primary benchmark for all vintages 2025 and beyond. The conservative 2010, 2015, 2020, and Income vintages have set the Bloomberg U.S. Aggregate Bond Rate (known as the "Agg") as their benchmarks.

76. Since 2017, every vintage of the Fidelity TDFs has been offered through three classes: the unlabeled original class that has been available since the beginning of the TDFs, and classes K and K6, which both launched in 2017.[5]

---

[5] Performance data for the K class is therefore only available from 2018 onwards. When evaluating the Fidelity TDFs in or about 2018, Defendants could only consider the performance of the earlier, unlabeled "class," so this data is used for any performance metrics considering the years 2010–2017.

77. Nearly every vintage class has a different expense ratio, but the trends across vintages and between classes are relatively constant. Generally, in 2020 and 2021, the 2010 vintage had an expense ratio approximately 0.19% lower than a 2040–2065 vintage in the same class (the 2040, 2045, 2050, 2055, 2060, and 2065 vintages have the same expense ratio in each class). Similarly, in every vintage, the K6 class was approximately 0.15% cheaper than the K class in 2020 and 2021. The difference is entirely made up of a revenue-sharing payment that is made to Fidelity as a party-in-interest.

78. From 2018 through 2021, the Plan offered the Fidelity TDFs through the K class.

79. In Plan Year 2022, Defendants shifted the Plan's holdings in the Fidelity TDFs into their CIT counterparts, although Defendants use the same exact name for the funds in the Plan's Forms 5500. Fidelity calls these counterparts the "Fidelity Freedom Commingled Pools." The Commingled Pool TDF counterparts have been offered on the Plan's menu every year since 2022. Throughout this period, the Commingled Pools have been offered through multiple share classes, of varying expense ratios.

80. As of the most recent Form 5500 filing (Plan Year 2024), the Plan has offered the Commingled Pool TDF counterparts through Class D. The Class D expense ratios for each vintage of the Commingled Pools are detailed below:

| Vintage | Class D Expense Ratio |
|---------|----------------------|
| Income | 0.24% |
| 2010 | 0.25% |
| 2015 | 0.27% |
| 2020 | 0.30% |
| 2025 | 0.35% |
| 2030 | 0.37% |
| 2035 | 0.37% |
| 2040 | 0.37% |
| 2045 | 0.37% |
| 2050 | 0.37% |
| 2055 | 0.37% |
| 2060 | 0.37% |
| 2065 | 0.37% |

81. Throughout the period when the Commingled Pools have been offered on the Plan's Menu, there were other share classes available which carried lower expense ratios but were otherwise identical with respect to performance, objectives, strategies, management, and risk profiles. The Plan has qualified for these cheaper share classes for as long as it has been invested in the Commingled Pools.

82. Three of these share classes offer expense ratios lower than that of the D class. Namely, for the 2030 vintage, the F class offered 0.35%, the H class offered 0.33%, and the J class offered 0.31%.

83. Given that the expense ratio for the 2030 vintage mirrors that of every later vintage for Class D, it follows that the expense ratio for the 2030 vintage for Class J is shared by the 2035–2065 vintages as well. During the Relevant Time Period, at least 71% of the TDF / Commingled Pool assets have been invested through the 2030 or later

vintages. This proportion has increased every year—as of 2024, these vintages hold 83% of the total assets.

84. The Commingled Pools are not required to set benchmarks by the SEC. Nevertheless, vintages 2025–2065 of the Commingled Pools have set the S&P 500 as their primary benchmark, mirroring the Fidelity TDF mutual fund counterpart. The conservative 2010, 2015, 2020, and Income vintages have also mirrored the mutual fund by setting the Bloomberg U.S. Aggregate Bond Rate as their benchmarks.

85. The Fidelity TDFs and Commingled Pools have nearly identical holdings, which are usually the mutual fund or CIT counterparts of the same assets. They also offer performance that is statistically nearly identical. In short, with respect to performance, the Fidelity TDFs and Commingled Pools are functionally identical, except that the Commingled Pools will post returns a few basis points better due to their lower fees.

86. For this reason, where direct performance data is not publicly available, the performance of the Fidelity Commingled Pools is shown by reference to the performance of the Fidelity TDFs over the same period.

### B. Fidelity Contrafund.

87. The Fidelity Contrafund was an investment option on the Plan's menu during the Relevant Time Period and was added to the Plan no later than 2008.

88. By the end of 2024, the Plan's participants had invested $25,649,745 in the Fidelity Contrafund.

89. The Fidelity Contrafund's managers designated the S&P 500 index as its primary benchmark.

90. Because the Fidelity Contrafund falls within the "Large Growth" category of funds, a more appropriate benchmark for the Fidelity Contrafund is the Russell 1000 Growth index.

91. Prior to 2008, the Fidelity Contrafund was only offered through a single share class, at an expense ratio of 0.63%. In 2008, the K class was added, at a cheaper expense ratio of 0.56%. The Plan has invested in the Fidelity Contrafund through class K as far back as 2009 (the earliest Form 5500 which is publicly available).

92. In 2017, a new, cheaper K6 share class was added, carrying an expense ratio of only 0.45%. To this day, it is the cheapest share class available.

### C. MFS Mid Cap Growth Fund.

93. The MFS Mid Cap Growth Fund has been an investment option on the Plan's menu throughout the Relevant Time Period, first added in 2017.

94. By the end of 2024, the Plan's participants had invested $5,900,000 in the MFS Mid Cap Growth Fund.

95. The fund's managers selected the Russell Mid Cap Growth Index as the primary benchmark for the MFS Mid Cap Growth Fund. However, the Plan's required participant fee disclosure statement, dated May 12, 2025, listed the Russell 3000 index as the benchmark for the MFS Mid Cap Growth Fund, materially misleading participants about the fund's true performance relative to an appropriate benchmark.

**V. Defendants Failed to Monitor the Investment Options on the Plan's Menu and Remove Imprudent Ones.**

96.     Defendants CIRI, the Board of Directors, and the Committee breached their fiduciary duties to Plaintiff and the Plan's participants by failing to monitor the investment options in the Plan's portfolio, as evidenced by: (1) their retention of the Funds as Plan investment options despite the Funds' consistent underperformance and excessive volatility over the past decade; (2) their failure to shift the Fidelity TDF and Fidelity Contrafund assets from the K class into the cheaper K6 class, despite the Plan qualifying for the move for as long as these Funds had been offered, and despite the substantial savings the Plan would enjoy due to such a move.

97.     Defendants also breached their fiduciary duties to Plaintiff and the Plan's participants by utilizing a fundamentally deficient process to evaluate the performance and costs of the investments on the Plan's menu, one that misused investment data in a manner contrary to the data publisher's clear instructions.

98.     The performance and cost issues posed by the Funds are merely an illustration of the myriad red flags the Plan's investments raised during the Relevant Time Period that were ignored or disregarded by Defendants.  The issues discussed herein apply to the Defendants' treatment of every investment on the menu, and thus discovery will reveal further underperformance and further cost issues of the other funds on the menu that Defendants failed to prudently monitor for and to which Defendants failed to respond.

99.     Avoiding or rectifying the process failures described herein and/or to be proven at trial did not require any specialized financial training, nor even particular

intelligence or insightfulness, on the part of Defendants. Defendants' failure to notice or remedy their failures over a several-year period reflects the complete abdication of their fiduciary responsibilities to the Plan.

**A. Throughout the Last Decade, the Funds Underperformed Their Benchmarks, and Yet Defendants Retained Them.**

100. Market research has shown that investors should be cautious about actively managed investments' ability to consistently beat their benchmarks, which is a major concern for long-term retirement savers, including Plan participants and beneficiaries.

101. Although they may find success over short timeframes, active investment managers rarely manage to time their trades well enough to beat the market.

102. This means that retirement plan fiduciaries must carefully analyze each active investment's ability to provide value and, if the investment does not, replace it with an active or passive investment that has demonstrated such capabilities.

103. In particular, where an active fund's benchmark also has one or more passive index funds tracking it—*i.e.*, funds that simply track the benchmark's holdings with limited management and very low costs—the active fund's repeated failure to beat the benchmark demonstrates that the index fund would provide better returns for the plan at lower cost.

104. Underperformance over a three- or five-year period is a cause for concern and scrutiny and can itself be a reason to remove an investment from a plan.

105. Underperformance over several consecutive three- or five-year trailing periods is cause for both alarm and action.

106. In measuring a given fund's performance and risk, plan fiduciaries consider several metrics, including the fund's "alpha" and "information ratio."

107. These metrics are publicly reported, or able to be determined by applying widely accepted mathematical formulas to publicly reported data. Where metrics are not available (*i.e.*, for a CIT), the same metrics of the CIT's mutual fund counterpart are publicly available.

108. The performance of a fund against its benchmark is measured by the "alpha" figure, which reflects the difference in return percentage compared to the benchmark. When a fund's alpha is positive, it generated more returns than the benchmark; when it is negative, it underperformed. An alpha of zero indicates an identical return compared to the benchmark.

109. The "information ratio" measures return versus risk in a given fund. To calculate the Information Ratio, the average difference in return compared to the benchmark is divided by the volatility of that return (which is represented by the standard deviation of the average). Specifically, the ratio measures how consistently a fund delivers an excess return compared to a benchmark fund.

110. For example, if a fund has an average return of 2% more than its benchmark over a given period, and the standard deviation of the fund's average return relative to the benchmark is 4%, then the information ratio over the period in question would be 0.5.

111. A 0.5 information ratio is generally the minimum acceptable to investors and responsible plan fiduciaries. An information ratio of 1.0 or higher is ideal because it signals

25

that the level of volatility in the fund is balanced against its performance in comparison to the benchmark.[6]

112.   A negative information ratio suggests that the benchmark may be a better investment, because it implies a negative average alpha.

113.   The basic purpose of an actively managed fund is to outperform the market, which is measured by the fund's performance against the benchmark the fund itself selected.  When a fund fails to beat that benchmark, it fails to achieve its core mission.

114.   Repeated failure to beat the benchmark is a serious red flag to any prudent fiduciary, because continuing to retain the fund despite that failure will expose the Plan to additional risk without any reasonable expectation of additional returns.  Unjustified risk is inherently imprudent.

115.   Underperformance can cost Plan participants thousands or hundreds of thousands of dollars in retirement funds.  For example, if the mean Plan participant here (with an account balance of $66,719 in 2020) would normally have an annual return of 5%, just a 0.5% decrease to the growth rate would cost him $2,008.22 in lost growth over five years.  As the decrease persists, the costs grow exponentially.

---

[6] *See* Robert Selouan, CAIA, CFA, *The power of information ratio (IR) in active management*, State Street Investment Management (March 2, 2026), https://www.ssga.com/us/en/intermediary/insights/the-power-of-information-ratio-ir-in-active-management ("Information ratios above 0.5 are often viewed as reflecting solid skill, while values above 1.0 are often seen as indicating strong, consistent value added")

**1. Throughout the Last Decade, the Fidelity TDFs Significantly Underperformed and Were Excessively Volatile. Better-Performing Comparators Existed. Yet, Defendants Retained the Fidelity TDFs.**

116. Throughout the Relevant Time Period, and in the period Defendants would have considered when evaluating the Fidelity TDFs at the beginning of the Relevant Time Period, the Fidelity TDFs were raising clear red flags for any fiduciary who cared to look.

117. Each vintage of the Fidelity TDFs shares the same underlying investments, but the proportion of those investments will change slightly based on the vintage. The various vintages, especially those targeting similar dates, will show similar but not identical performance.

118. In all years during the Relevant Time Period—and during the periods where the Fidelity TDFs were offered as mutual funds and CITs—most participants had invested in the 2035 vintage. For this reason, and for ease of reading, Plaintiff will use the performance of the 2035 vintage as an example of the Fidelity TDFs' underperformance.

119. In 2020, during the first quarterly reviews of the Relevant Time Period, the Fidelity TDFs' three-year, five-year, and ten-year average alphas were all deep in the red, lagging the S&P 500 benchmark by an average of 4.00%, 3.03%, and 4.46% per year, respectively. These figures have all worsened since, posting three-year and five-year average alphas showing a drag of nearly 7% compared to the S&P 500. The ten-year average alpha in 2025 showed a drag of 5% compared to the S&P 500. Looking back at the last 15 years of data, the three-, five-, and ten-year average alphas have *never* been positive.

120.  Overall, only *three times* since 2010 has the Fidelity TDF's annual performance beaten the S&P 500 at all.  By contrast, in three years since 2010, the Fidelity TDFs have lagged the S&P 500 by double digits.

121.  Unsurprisingly, the three-year, five-year, and ten-year information ratios against the S&P 500 have also never been positive, let alone exceeded the 0.5 minimum threshold.

122.  This poor performance is actually the best performance of all vintages that use the S&P 500 as their benchmark.  The 2035 vintage has beaten the S&P 500 three times in the last fifteen years.  The 2040–2060 vintages have only beaten it twice.  The 2025 and 2030 vintages have beaten the benchmark only once.

123.  This lost growth is not only palpable but dramatic.  A Plan participant holding the mean-average account balance in 2010 would have lost out on $82,067 in growth over the past 15 years by investing in the Fidelity TDFs compared to investing in an index fund tracking the S&P 500.  A Plan participant holding the mean-average account balance in 2015 would have lost out on $54,906 in growth over the past 10 years.  A Plan participant holding the mean-average account balance in 2020 would have lost out on $67,584 in growth over just the past five years.  Using any of these timeframes, the lost value meets or exceeds the median annual retirement income in the United States in 2025.[7]  In other words, for a Plan participant hoping to retire on the median income of an American retiree,

---

[7] *Uncovering Americans' average retirement income*, THE CURRENCY (Jan. 28, 2026) https://www.empower.com/the-currency/life/average-retirement-income (reporting finding that 2025 median U.S. retirement household income for adults 65+ was $56,860, including all income sources).

this lost value has already shortened or delayed his retirement by a year or more.  If this dramatic lag persists through the target retirement year, the above figures explode exponentially: the lost value would support the median American retiree for between six to fifteen years depending on the date he started saving.

124.    There are many index funds that track the S&P 500, *e.g.*, the Schwab S&P 500 Index Fund.  The Schwab S&P 500 Index Fund has been available since 1996 and has an expense ratio of only 0.02%.  The Plan has qualified to invest in the Schwab S&P 500 Index Fund for the entire Relevant Time Period.

125.    Because the Fidelity TDFs underperformed the S&P 500 throughout the Relevant Time Period, had CIRI invested in the Schwab S&P 500 Index Fund or a similar index fund tracking the S&P 500, the Plan's returns would have been greater, and its expenses would have been lower during that period as well, yielding a significantly greater overall return.

126.    Throughout the Relevant Time Period, there were also many comparable active funds available that matched the objectives, risks, strategies, and style of the Fidelity TDFs, but which were not suffering the same underperformance and/or volatility.  These included, for example, the American Funds Retirement TDF, the T. Rowe Price Retirement TDF, and the Nuveen Lifecycle Index Fund (Class I).

127. According to the prospectuses of the American Funds TDF and the Fidelity TDFs,[8] the American Funds TDF shares the Fidelity TDFs' objective of capital appreciation. It also shares the Fidelity TDFs' key strategies, namely employing a "glide path" that alters the balance of domestic equity, foreign equity, bonds, and debt, with the proportion of bonds increasing and equities decreasing as the retirement date approaches, and it aims to manage investments "through" the retirement date. It also shares the Fidelity TDFs' principal investment risks and their "Large Blend" style category. Like the Fidelity TDFs, the American Funds TDF is actively managed.

128. Over the past fifteen years, the American Funds TDF has outperformed the Fidelity TDFs in ten years. On average, since 2010, the American Funds TDF has delivered returns 76 basis points higher than the Fidelity TDFs. A participant with the mean account balance in 2010 would have seen a $10,712 increase in the value of his account since then by investing in the American Funds TDFs compared to the Fidelity TDFs. If the lag persists through 2035 (the target retirement year), that $10,712 will grow to $44,130, nearly a year's income for the median American retiree.

129. According to the prospectuses of the T. Rowe Price TDFs and the Fidelity TDFs, the T. Rowe Price TDF shares the Fidelity TDFs' objective of capital appreciation. It also shares the Fidelity TDFs' key strategies, namely employing a "glide path" that alters the balance of domestic equity, foreign equity, bonds, and debt, with the proportion of

---

[8] The Commingled Pools are not required to issue a prospectus, but as the CIT counterpart of the Fidelity TDFs, the Commingled Pools' objectives, strategies, and risk profiles match those of the Fidelity TDFs.

bonds increasing and equities decreasing as the retirement date approaches, and it aims to manage investments "through" the retirement date. It also shares the Fidelity TDFs' principal investment risks and their "Large Blend" style category. Like the Fidelity TDFs, the T. Rowe Price TDF is actively managed.

130. Over the past fifteen years, the T. Rowe Price TDF has outperformed the Fidelity TDFs in ten years. On average, since 2010, the T. Rowe Price TDF has delivered returns 46 basis points higher than the Fidelity TDFs. A participant with the mean account balance in 2010 would have seen a $5,711 increase in the value of his account since then by investing in the T. Rowe Price TDF compared to the Fidelity TDFs. If the lag persists through 2035 (the target retirement year), that $5,711 will grow to $23,109, nearly half a year's income for the median American retiree.

131. The IPS requires the Committee to monitor the Plan's investments. This includes a quarterly consideration of each Fund's "[p]erformance and risk levels over various periods[.]"

132. The foregoing red flags in the performance and risk levels of the Fidelity TDFs / Commingled Pools over three-, five-, and ten-year periods, and the similar figures for the American Funds TDF and the T. Rowe Price TDF are publicly reported, or able to be determined by applying widely-accepted formulas to publicly reported data.

133. Had Defendants prudently reviewed the Fidelity TDFs / Commingled Pools as required by the IPS prior to 2025, they would have observed their consistent underperformance against the S&P 500. They also would have seen that there were comparable funds offering better performance and/or stability compared to the Fidelity

31

TDFs / Commingled Pools.  A prudent fiduciary in CIRI's position would have removed the Fidelity TDFs / Commingled Pools from the Plan.

134.    The Fidelity TDFs' / Commingled Pools' survival on the Plan menu despite these long-present, glaring red flags evidences a deficient investment monitoring process: these signs of underperformance were either missed, misunderstood, or intentionally disregarded by the Plan's fiduciaries during dozens of consecutive quarterly reviews, or the quarterly reviews did not actually occur as required by the IPS.  In other words, even to the extent that following the processes and procedures in the IPS would have been sufficient for Defendants to comply with their fiduciary and other legal obligations, Defendants simply did not follow them.

### 2. Throughout the Last Decade, the Fidelity Contrafund Significantly Underperformed and Was Excessively Volatile.  Better-Performing Comparators Existed.  Yet, Defendants Retained It.

135.    Throughout the Relevant Time Period, and in the period Defendants would have considered when evaluating the Fidelity Contrafund at the beginning of the Relevant Time Period, the Fidelity Contrafund was raising clear red flags for any fiduciary who cared to look.

136.    In 2020, during the first quarterly reviews of the Relevant Time Period, the Fidelity Contrafund's three-year, five-year, and ten-year average alphas were all deep in the red, lagging the Russell 1000 Growth benchmark by an average of 4.20%, 2.81%, and 1.73% each year.  Looking back at the last 15 years of data, the three-year average alpha

32

has been positive only *twice*. The five-year average alpha has only been positive once. The ten-year average alpha has *never* been positive.

137. Overall, the Fidelity Contrafund's performance against the Russell 1000 Growth since 2010 has jockeyed between very modest gains and dramatic losses.

138. Unsurprisingly, considering the past 15 years of data, the three-year information ratio has only been positive twice. The five-year information ratio has only been positive once. The ten-year information ratio has never been positive. None has ever exceeded the 0.5 minimum threshold during that time.

139. This lost growth is not only palpable but dramatic. A Plan participant holding the mean-average account balance in 2010 would have lost out on $28,252 in growth over the past 15 years by investing in the Fidelity Contrafund compared to investing in an index fund tracking the Russell 1000 Growth. A Plan participant holding the mean-average account balance in 2015 would have lost out on $18,998 in growth over the past 10 years. A Plan participant holding the mean-average account balance in 2020 would have lost out on $13,061 in growth over just the past five years.

140. There are many index funds that track the Russell 1000 Growth Index, *e.g.*, the Vanguard Russell 1000 Growth Index Fund. The Vanguard Russell 1000 Growth Index Fund has been available since 2010 and has an expense ratio of only 0.05%. The Plan has qualified to invest in the Vanguard Russell 1000 Growth Index Fund for the entire Relevant Time Period.

141. Because the Fidelity Contrafund underperformed the Russell 1000 Growth throughout the Relevant Time Period, had CIRI invested in the Vanguard Russell 1000

Growth Index Fund or a similar index fund tracking the Russell 1000 Growth, the Plan's returns would have been greater, and its expenses would have been lower during that period as well, yielding a significantly greater overall return.

142. Throughout the Relevant Time Period, there were also many comparable active funds available that matched the objectives, risks, strategies, and style of the Fidelity Contrafund, but which were not suffering the same underperformance and/or volatility. These included, for example, the Fidelity OTC Portfolio (Class K), the Fidelity Blue Chip Growth Fund (Class K), and the Alger Focus Equity Fund (Class Z).

143. According to the prospectuses of the Fidelity OTC Portfolio and the Fidelity Contrafund, the OTC Portfolio shares the Contrafund's objective of capital appreciation. It also shares the Contrafund's key strategies, including investing in common stocks, domestic and foreign issuers, and a blend of growth and value stocks, among others. It also shares the Contrafund's principal investment risks and its "Large Growth" style category. Finally, as a fellow Fidelity fund, it shares much of the same institutional fingerprint as the Contrafund.

144. Over the past fifteen years, the Fidelity OTC Portfolio (Class K) has outperformed the Contrafund in ten years. Twice, it outperformed the Contrafund by double digits. On average, over the past fifteen years, the OTC Portfolio has delivered returns 3.11% higher than the Contrafund. A participant with the mean account balance in 2010 would have seen an $83,876 increase in the value of his account since then by investing in the OTC Portfolio compared to the Contrafund. This amount alone would support the median American retiree for roughly a year and a half.

145. According to the prospectuses of the Fidelity Blue Chip Growth Fund and the Fidelity Contrafund, the Blue Chip Growth Fund shares the Contrafund's objective of capital appreciation. It also shares many of the Contrafund's key strategies, including investing in common stocks, domestic and foreign issuers, and growth stocks, among others. It also shares the Contrafund's principal investment risks and its "Large Growth" style category. Finally, as a fellow Fidelity fund, it shares much of the same institutional fingerprint as the Contrafund. The Plan qualified to invest in the Blue Chip Growth Fund throughout the Relevant Time Period.

146. Over the past fifteen years, the Fidelity Blue Chip Growth Fund (Class K) has also outperformed the Contrafund in ten years, and also twice by double digits. On average, since 2010, the Blue Chip Growth Fund has delivered returns 3.57% higher than the Contrafund. A participant with the mean account balance in 2010 would have seen a $77,868 increase in the value of his account since then by investing in the Blue Chip Growth Fund compared to the Contrafund. This amount alone would support the median American retiree for more than a year.

147. According to the prospectuses of the Alger Focus Equity Fund and the Fidelity Contrafund, the Focus Fund shares the Contrafund's objective of capital appreciation. It also shares many of the Contrafund's key strategies, including investing in common stocks, domestic and foreign issuers, and growth stocks, among others. It also shares the Contrafund's principal investment risks and its style category of "Large Growth." The Plan qualified to invest in the Focus Fund throughout the Relevant Time Period.

35

148. In the thirteen years of return data available for the Alger Focus Equity Fund (Class Z), it has outperformed the Fidelity Contrafund in ten years. In three of those years, it outperformed by double digits. On average, since 2013, the Focus Fund has delivered returns 4.31% higher than the Contrafund. A participant with the mean account balance in 2015 would have seen a $70,534 increase in the value of his account since then by investing in the Focus Fund compared to the Contrafund. This amount alone would support the median American retiree for more than a year.

149. The IPS requires the Committee to monitor the Plan's investments. This includes a quarterly consideration of each Fund's "[p]erformance and risk levels over various periods[.]"

150. The foregoing red flags in the Fidelity Contrafund's performance and risk levels over three-, five-, and ten-year periods, and the same figures for the OTC Portfolio, Blue Chip Growth Fund, and Focus Fund are publicly reported, or able to be determined by applying widely-accepted formulas to publicly reported data.

151. Had Defendants prudently reviewed the Fidelity Contrafund as required by the IPS prior to 2025, they would have observed its consistent underperformance against the Russell 1000 Growth, its primary benchmark. They also would have seen that there were comparable funds offering better performance and/or stability compared to the Fidelity Contrafund, including some provided by Fidelity itself. A prudent fiduciary in CIRI's position would have removed the Fidelity Contrafund from the Plan.

152. The Fidelity Contrafund's survival on the Plan menu despite these long-present, glaring red flags evidences a deficient investment monitoring process: these signs

of underperformance were either missed, misunderstood, or intentionally disregarded by the Plan's fiduciaries during dozens of consecutive quarterly reviews, or the quarterly reviews did not actually occur as required by the IPS. In other words, even to the extent that following the processes and procedures in the IPS would have been sufficient for Defendants to comply with their fiduciary and other legal obligations, Defendants simply did not follow them.

### 3. Throughout the Last Decade, the MFS Mid Cap Growth Fund Significantly Underperformed and Was Excessively Volatile. Better-Performing Comparators Existed. Yet, Defendants Retained It.

153. Throughout the Relevant Time Period, and in the period Defendants would have considered when evaluating the MFS Mid Cap Growth Fund at the beginning of the Relevant Time Period, the MFS Mid Cap Growth Fund was raising clear red flags for any fiduciary who cared to look.

154. To the extent Defendants were watching the performance of the MFS Mid Cap Growth Fund at all, a relatively healthy performance picture in 2020 was quickly tarnished as the MFS Mid Cap Growth Fund sunk steadily into the red over the Relevant Time Period.

155. In 2020, the Fund's three-, five-, and ten-year average alphas were all positive against its primary benchmark (the Russell Mid Cap Growth) and its secondary benchmark (the S&P 500), as well as against the index the Plan incorrectly stated was the fund's benchmark (the Russell 3000). Only its ten-year information ratios fell below the 0.5 threshold.

156. Every year since 2021, the MFS Mid Cap Growth Fund has lagged behind *all three benchmarks*. In 2021, it lagged behind both the S&P 500 and the Russell 3000. Moreover, its alphas have a negative trend over time against all three benchmarks. To any prudent observer, the MFS Mid Cap Growth Fund has been in a tailspin for five years straight.

157. This lost growth is not only palpable but dramatic. No matter what benchmark is used, a Plan participant holding the mean-average account balance in 2010, 2015, or 2020 would have lost out on significant growth over the period since. This is shown in the table below:

*MFS Mid Cap Growth – Lost Value Against Benchmarks*

| Year | Mean Plan Balance | Lost Value vs. Russell Mid Cap | Lost Value vs. S&P 500 | Lost Value vs. Russell 3000 |
|---|---|---|---|---|
| **2010** | $19,913 | $10,126 | $34,071 | $26,378 |
| **2015** | $38,429 | $4,870 | $35,597 | $27,205 |
| **2020** | $66,719 | $18,068 | $76,837 | $65,367 |

158. There are many index funds that track the Russell Mid Cap Growth Index, *e.g.*, the iShares Russell Mid-Cap Growth ETF. The iShares Russell Mid-Cap Growth ETF has been available since 2001 and has an expense ratio of only 0.23%. The Plan has qualified to invest in the iShares Russell Mid-Cap Growth ETF for the entire Relevant Time Period.

159. There are many index funds that track the S&P 500, *e.g.*, the Schwab S&P 500 Index Fund. The Schwab S&P 500 Index Fund has been available since 1996 and has an expense ratio of only 0.02%. The Plan has qualified to invest in the Schwab S&P 500 Index Fund for the entire Relevant Time Period.

38

160. There are many index funds that track the Russell 3000, *e.g.*, the Vanguard Russell 3000 Index Fund. The Vanguard Russell 3000 Index Fund has been available since 2010 and has an expense ratio of only 0.07%. The Plan has qualified to invest in the Vanguard Russell 3000 Index Fund for the entire Relevant Time Period.

161. Because the MFS Mid Cap Growth Fund underperformed the Russell Mid Cap Growth Index, the S&P 500, *and* the Russell 3000 throughout the Relevant Time Period, had CIRI invested in any of the named index funds, or similar index funds tracking these indices, the Plan's returns would have been greater, and its expenses would have been lower during that period as well, yielding a significantly greater overall return.

162. Throughout the Relevant Time Period, there were also many comparable active funds available that matched the objectives, risks, strategies, and style of the MFS Mid Cap Growth Fund, but which were not suffering the same underperformance and/or volatility. These included, for example, the Baron Focused Growth Fund (Institutional Class), the Primecap Odyssey Aggressive Growth Fund, and the Primecap Odyssey Growth Fund.

163. According to the prospectuses of the Baron Focused Growth Fund and the MFS Mid Cap Growth Fund, the Baron Fund shares the MFS Mid Cap Growth Fund's objective of capital appreciation. It also shares the MFS Mid Cap Growth Fund's key strategies, including investing in growth stocks of mid-cap domestic companies, among others. It also shares the MFS Mid Cap Growth Fund's principal investment risks and its "Mid-Cap Growth" style category.

164.     Over the past fifteen years, the Baron Fund has outperformed the MFS Mid Cap Growth Fund in nine.  On average, since 2010, the T. Rowe Price Fund has delivered returns 6.27% higher than the MFS Mid Cap Growth Fund.  A participant with the mean account balance in 2010 would have seen a $112,642 increase in the value of his account since then by investing in the Baron Fund compared to the MFS Mid Cap Growth Fund.  This amount alone would support the median American retiree for two years.

165.     According to the prospectuses of the Primecap Odyssey Aggressive Growth Fund and the MFS Mid Cap Growth Fund, the Odyssey Aggressive Fund shares the MFS Mid Cap Growth Fund's objective of capital appreciation.  It also shares the MFS Mid Cap Growth Fund's key strategies, including investing in growth stocks in large- and mid-cap domestic companies, among others.  It also shares the MFS Mid Cap Growth Fund's principal investment risks and its "Mid-Cap Growth" style category.

166.     Over the past fifteen years, the Odyssey Aggressive Fund has outperformed the MFS Mid Cap Growth Fund in nine.  In two of those years, it outperformed by double digits.  On average, since 2010, the Odyssey Aggressive Fund has delivered returns 2.41% higher than the MFS Mid Cap Growth Fund.  A participant with the mean account balance in 2010 would have seen a $52,725 increase in the value of his account since then by investing in the Odyssey Aggressive Fund compared to the MFS Mid Cap Growth Fund.  This amount alone would support the median American retiree for nearly a year.

167.     According to the prospectuses of the Primecap Odyssey Growth Fund and the MFS Mid Cap Growth Fund, the Odyssey Fund shares the MFS Mid Cap Growth Fund's objective of capital appreciation.  It also shares the MFS Mid Cap Growth Fund's

key strategies, including investing in growth stocks in large- and mid-cap domestic companies, among others. It also shares the MFS Mid Cap Growth Fund's principal investment risks and its "Mid-Cap Growth" style category.

168. Over the past fifteen years, the Odyssey Fund has outperformed the MFS Mid Cap Growth Fund in eleven years. In two of those years, it outperformed by double digits. On average, since 2010, the Odyssey Fund has delivered returns 1.11% higher than the MFS Mid Cap Growth Fund. A participant with the mean account balance in 2010 would have seen a $34,447 increase in the value of his account since then by investing in the Odyssey Fund compared to the MFS Mid Cap Growth Fund. This amount alone would support the median American retiree for most of a year.

169. The IPS requires the Committee to monitor the Plan's investments. This includes a quarterly consideration of each Fund's "[p]erformance and risk levels over various periods[.]"

170. The foregoing red flags in the MFS Mid Cap Growth Fund's performance and risk levels over three-, five-, and ten-year periods, and the same figures for the Primecap Odyssey Growth Fund, JPMorgan Mid Cap Growth Fund, and T. Rowe Price Mid Cap Growth Fund, are publicly reported, or able to be determined by applying widely-accepted formulas to publicly reported data.

171. Had Defendants prudently reviewed the MFS Mid Cap Growth Fund as required by the IPS prior to 2025, they would have observed its consistent underperformance against its own benchmark, and even against the benchmark Defendants incorrectly stated was applicable. They also would have seen that there were comparable

41

funds offering better performance and/or stability compared to the MFS Mid Cap Growth Fund.  A prudent fiduciary in CIRI's position would have removed the MFS Mid Cap Growth Fund from the Plan.

172.    The MFS Mid Cap Growth Fund's survival on the Plan menu despite these long-present, glaring red flags evidences a deficient investment monitoring process: these signs of underperformance were either missed, misunderstood, or intentionally disregarded by the Plan's fiduciaries during dozens of consecutive quarterly reviews, or the quarterly reviews did not actually occur as required by the IPS.  In other words, even to the extent that following the processes and procedures in the IPS would have been sufficient for Defendants to comply with their fiduciary and other legal obligations, Defendants simply did not follow them.

**B.      For Nearly a Decade, the Plan's Fidelity TDF and Fidelity Contrafund Assets Qualified for Cheaper but Otherwise-Identical Share Classes, Yet Defendants Failed to Seize These Immense Savings.**

173.    As alleged previously, many funds offer multiple "share classes."  Share classes in a single fund are targeted at different investors.  These share classes generally hold the same components, use the same managers, and follow the same investment objectives and policies.  They mainly differ in the structure and amount of their fees and expenses.

174.    The Fidelity TDFs and Fidelity Contrafund each offered different, less expensive share classes for which the Plan qualified throughout the Relevant Time Period.

175. The Plan's IPS requires the Committee to periodically review and evaluate the fees imposed by the Plan's investments.

176. Had Defendants properly reviewed the Fidelity TDFs' and Fidelity Contrafund's costs as required by the IPS, they would have observed that the less expensive but otherwise identical share classes were available to the Plan throughout the Relevant Time Period.

177. Nevertheless, CIRI did not elect to move the Plan's assets into the cheaper share classes.

### 1. By Switching to a Cheaper Share Class of the Fidelity TDFs, For Which the Plan Qualified Throughout the Relevant Time Period, the Plan Could Have Saved Millions for the Same Performance. Yet Defendants Took No Action.

178. The Fidelity Freedom K6 class was first introduced for the then-current vintages of the Fidelity TDFs in June 2017. It carries an expense ratio of 0.24% to 0.45%, depending on the vintage.

179. The K class launched across the then-current vintages in July 2017. It carries an expense ratio of 0.42% to 0.65%, depending on the vintage.

180. The K class and K6 class hold identical underlying investments, use the same portfolio managers, and follow the same investment objectives and policies. The only tangible difference is 20 basis points of cost.

181. In 2018, the Plan qualified for the cheaper K6 class, and it continued to qualify for the K6 class throughout the Relevant Time Period. Nevertheless, in 2018, Defendant CIRI (by and through the Committee) selected the more expensive K class.

43

182. In 2022, the Plan moved the Fidelity TDF assets into the TDFs' CIT counterparts, the "Commingled Pools." Defendants selected the D share class of the Commingled Pools and have retained the D share class in every year since. CIT share classes are similar to mutual fund share classes in that they mainly differ in the amount and structure of their fees; they share the same managers, objectives, strategies, styles, and risk profiles.

183. As explained above, every year that the Commingled Pools have been on the Plan's menu, at least three share classes cheaper than Class D have been available. For the 2030–2065 vintages—the lion's share of the Plan's Commingled Pools holdings—Class J offered an expense ratio of 0.31%.

184. Defendants' inaction has put a significant and unjustifiable drag on the growth of Plan participants' accounts throughout the Relevant Time Period and before. Given the immense sums of the participants' monies that were invested in the Fidelity TDFs as reported on the Plan's Forms 5500, had Defendants taken advantage of the cheaper share class at any point, the savings to the Plan would have amounted to several hundred thousand dollars every year. This is examined in more detail in the table below, using the 2030 vintage as an example:

*Fidelity TDFs – Assets and Fees (2030 Vintage Only)*

| Plan Years | 2024 | 2023 | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|
| Holdings | $42,187,198 | $38,974,496 | $32,251,745 | $34,432,967 | $29,248,510 |
| K Fee | - | - | - | $203,155 | $172,566 |
| K6 Fee | - | - | - | $158,392 | $137,468 |
| D Fee | $156,093 | $144,206 | $119,331 | - | - |
| J Fee | $130,780 | $120,821 | $99,980 | - | - |
| Excess Costs | $25,312 | $23,385 | $19,351 | $44,763 | $35,098 |

185. In total, just during the Relevant Time Period, retaining participants' assets in the K and D share classes rather than shifting them to the K6 and J classes has cost the Plan at least $147,909 *for the 2030 vintage alone.*

186. Considering the total TDF holdings across all vintages—and using (1) the average K-class and K6-class expense ratios across all vintages in 2020–2021 and (2) the D-class and J-class expense ratios expense ratios across all vintages in 2022–2024—the failure to move to cheaper share classes has cost the Plan at least an estimated $1,605,392. Because the Fidelity Commingled Pool holdings remain in CIT class D today, data as to the Plan's TDF holdings in 2025 and 2026 will reveal further unnecessary costs to the Plan during the Relevant Time Period.

187. To make matters worse, the estimated damages above do not capture the full cost of retaining the more expensive share classes because they do not account for compounding growth: the money saved each year would have remained in participants' accounts and continued to grow over time.

188. Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and can demand lower cost share classes in the marketplace.

189. Prudent, similarly situated fiduciaries will use their bargaining power to select the lowest-priced share class available.

190. Given the Plan's size, expected growth, and resulting negotiating power, with prudent management and administration, the Plan should unquestionably have been able to switch to share classes that were significantly lower cost than the K and D class fees above. Because for a decade straight, the Plan could have switched to otherwise-identical share classes that were significantly cheaper, CIRI's failure to do so evidences Defendants' consistent failure to monitor the Plan's investments, and thus a breach of fiduciary duty.

191. The Plan's IPS requires the Committee and its advisor to "periodically review and evaluate the fees and costs of the Plan including investment management, trust and custody, administrative services, education and consulting fees."

192. Defendants' persistent failure over the past decade to move the investments into lower-cost share classes evidences a deficient process by which fund expenses were considered, compared, and evaluated by the Plan fiduciaries: the fiduciaries either did not monitor the fees imposed by the Fidelity TDFs / Commingled Pools as the IPS requires, did not realize that lower-cost share classes were available, did not appreciate the benefit of transferring the Plan's holdings into those share classes, or intentionally disregarded those benefits. In any of these scenarios, Defendants failed to prudently monitor the costs of the Fidelity TDFs / Commingled Pools as ERISA requires. In other words, even to the extent that following the processes and procedures in the IPS would have been sufficient for Defendants to comply with their fiduciary and other legal obligations, Defendants simply did not follow them.

**2.** **By Switching to a Cheaper Share Class of the Fidelity Contrafund, For Which the Plan Qualified Throughout the Relevant Time Period, the Plan Could Have Saved Over $100,000 for the Same Performance. Yet Defendants Took No Action.**

193. The Fidelity Contrafund K class was first introduced in 2008. It carries an expense ratio of 0.56%. According to the Plan's Forms 5500, the Plan has offered the Fidelity Contrafund through Class K since at least 2014.

194. In 2017, Fidelity also introduced the K6 class for the Contrafund, with a cheaper expense ratio of only 0.45%.

195. The K class and K6 class hold identical underlying investments, use the same portfolio managers, and follow the same investment objectives and policies. The sole material difference between them is that the K class charges a higher expense ratio.

196. In 2018, the Plan qualified for the cheaper K6 class, and it continued to qualify for the K6 class throughout the Relevant Time Period. Nevertheless, in 2018, Defendant CIRI (by and through the Committee) retained the more expensive K class. In every subsequent review of the Fidelity Contrafund from 2018 to 2025, Defendants continued to retain the K class, despite the significant savings potential. It was not until Plan Year 2025 that Defendants finally moved the holdings to the K6 class.

197. Defendants' seven years of inaction have put a significant and unjustifiable drag on the growth of Plan participants' accounts throughout the Relevant Time Period and before. Given the sums of the participants' monies that were invested in the Fidelity Contrafund as reported on the Plan's Forms 5500, had Defendants taken advantage of the

47

cheaper share class at any point, the savings to the Plan would have amounted to several hundred thousand dollars every year. This is examined in more detail in the table below:

*Fidelity Contrafund – Assets and Fees*

| Plan Years | 2024 | 2023 | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|
| Holdings | $25,649,745 | $19,264,951 | $13,956,089 | $21,197,017 | $17,490,544 |
| K Fee | $143,639 | $107,884 | $78,154 | $118,703 | $97,947 |
| K6 Fee | $115,424 | $86,692 | $62,802 | $95,387 | $78,707 |
| Excess Costs | **$28,215** | **$21,191** | **$15,352** | **$23,317** | **$19,240** |

198. In total, and just during the Relevant Time Period, retaining participants' assets in the K share class rather than shifting them to the K6 class has cost the Plan at least $107,314.

199. To make matters worse, the estimated damages above do not capture the full cost of retaining the more expensive share classes because they do not account for compounding growth: the money saved each year would have remained in participants' accounts and continued to grow over time.

200. Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and can demand lower cost share classes in the marketplace.

201. Prudent, similarly situated fiduciaries will use their bargaining power to select the lowest-priced share class available.

202. Given the Plan's size, expected growth, and resulting negotiating power, with prudent management and administration, the Plan should unquestionably have been able to switch to share classes that were significantly lower cost than the K class fees above. Because for nearly a decade straight, the Plan could have switched to otherwise-identical

share classes that were significantly cheaper, CIRI's failure to do so evidences Defendants' consistent failure to monitor the Plan's investments, and thus a breach of fiduciary duty.

203. The Plan's IPS requires the Committee to "periodically review and evaluate the fees and costs of the Plan including investment management, trust and custody, administrative services, education and consulting fees."

204. The Committee's persistent failure over the past decade to move the Fidelity Contrafund assets into a lower-cost share class evidences a deficient process by which fund expenses were considered, compared, and evaluated by the Plan fiduciaries: the fiduciaries either did not monitor the costs of the Fidelity Contrafund as required by the IPS, did not realize that lower-cost share classes were available, did not appreciate the benefit of transferring the Plan's holdings into those share classes, or intentionally disregarded those benefits. In any of these scenarios, Defendants failed to prudently monitor the Fidelity Contrafund's costs as ERISA requires. In other words, even to the extent that following the processes and procedures in the IPS would have been sufficient for Defendants to comply with their fiduciary and other legal obligations, Defendants simply did not follow them.

## VI. Throughout the Relevant Time Period, CIRI Has Paid UBS at least $250,000 from Plan Assets.

205. As part of its fiduciary duties under ERISA, CIRI is prohibited from paying parties-in-interest using the assets of the Plan.

206. The Plan's Forms 5500 filed during the Relevant Time Period state that UBS was paid at least $45,000 per year directly by the Plan.

207. When service providers such as UBS are paid directly by a plan, those fees are drawn from the Plan's assets. In other words, each participant pays for UBS's services quarterly from their investment account balance.

208. The most recent audit of the Plan, appended to the Plan's Form 5500 for Plan Year 2024, states that the "Plan operates on a per-participant fee that is deducted from participant accounts."

209. During the Relevant Time Period, Defendant CIRI caused the Plan to pay management fees to UBS that far exceeded the reasonable market rate, using Plan assets.

210. Since 2020, UBS has charged the Plan an average of $49,700 per year for its services. These payments have totaled in excess of $250,000.

211. Under ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), fiduciaries are prohibited from directing Plan assets to parties-in-interest (such as the Plan's investment advisor). These payments to UBS violated that prohibition.

## CLASS ACTION ALLEGATIONS

212. ERISA authorizes any plan participant or beneficiary to bring an action individually on behalf of the plan for appropriate relief under 29 U.S.C. § 1109(a) for a plan fiduciary's breach of duty, including all losses resulting from such breach and such other equitable or remedial relief the court may deem appropriate. *See* 29 U.S.C. § 1132(a)(2).

213. Acting in this representative capacity, and as an alternative to numerous direct individual actions brought by participants on behalf of the Plan under 29 U.S.C. §

1132(a)(2), Plaintiff seeks to certify this action on behalf of all participants and beneficiaries of the Plan.

214. Plaintiff seeks to certify the following class, and to be appointed as the representative on behalf of the following class:

> All participants and beneficiaries in the Cook Inlet Region 401(k) Retirement Plan at any time during the Relevant Time Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case.

215. The Relevant Time Period is defined as six years prior to the filing of this Complaint and continuing through the date of judgment in this action.

216. The Class includes thousands of members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

217. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owe fiduciary duties to the Plan and took the acts and omissions alleged as to the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to:

a. Whether Defendants are fiduciaries of the Plan;

b. Whether, for how long, and how deeply the Fidelity TDFs underperformed their benchmarks;

c. Whether, for how long, and how deeply the Fidelity Contrafund underperformed its benchmarks;

d. Whether, for how long, and how deeply the MFS Mid Cap Growth Fund underperformed its benchmarks;

e. Whether and for how long the Plan qualified for the lower-cost K6 share class of the Fidelity TDFs;

f. Whether and for how long the Plan qualified for the lower-cost K6 share class of the Fidelity Contrafund;

g. Whether Defendants breached their fiduciary duties under ERISA by failing to take action against the underperforming and needlessly expensive Funds after years of warning signs;

h. Whether CIRI and the CIRI Board of Directors breached their fiduciary duties under ERISA to monitor the performance of the Committee;

i. Whether any Defendant knew of any of its co-Defendants' breaches of fiduciary duty, and if so, what efforts it made to remedy those breaches;

j. Whether Defendant CIRI engaged in prohibited transactions by paying UBS using Plan assets and by maintaining revenue-sharing share classes that transferred Plan assets to Fidelity;

k. Whether the Plan suffered losses from Defendants' breach(es);

l. The manner in which the Plan's losses can be calculated; and

m. What equitable relief, if any, is appropriate for Defendants' breach(es).

218. Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3) because Plaintiff was a Plan participant during the time

period at issue and the participants in the Plan were harmed by Defendants' fiduciary misconduct in the same manner.

219. Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a Plan participant in the Plan during the Relevant Time Period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent counsel to represent the Class.

220. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants concerning their discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

221. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

222. Plaintiff's attorneys are experienced in complex employment class actions, including ERISA litigation, and will adequately represent the Class.

**FIRST CLAIM FOR RELIEF**
**Breach of Fiduciary Duties Under ERISA**
**Against All Defendants**

223. Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

224. By exercising authority and/or control with respect to the management of the Plan and their assets, and/or by being designated in the governing document of the Plan as fiduciaries, Defendants CIRI, the CIRI Board of Directors, and the Committee are fiduciaries of the Plan within the meaning of ERISA §§ 3(21) and 402(a), 29 U.S.C. §§ 1002(21) and 1102(a).

225. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), imposes a fiduciary duty of prudence upon Defendants in managing the investments of the Plan.

226. ERISA requires Defendants to discharge their duties to the Plan and participants with the care, skill, prudence, and diligence of a competent investment fiduciary charged with responsibility for investing hundreds of millions of dollars of retirement savings on behalf of thousands of investors.

227. Defendants, as fiduciaries of the Plan, are responsible for selecting and maintaining prudent investment options and taking any other necessary steps within their fiduciary authority to ensure that the Plan's assets are invested prudently.

228. Among Defendants' fiduciary duties under ERISA is the continuing duty to monitor the performance and costs of the Plan's investment options, and remove those

54

which are imprudent, whether they are imprudent from their initial selection or become imprudent over time.

229. Common law and ERISA's duty of prudence required Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1.

230. During the Relevant Time Period, Defendants breached their fiduciary duties of prudence to Plan participants, including to Plaintiff, by failing to monitor the Plan's investments and expenses and remove imprudent ones. This can be reasonably inferred because:

    a. Defendants maintained the Funds in the Plan, though the Fidelity TDFs / Commingled Pools, Fidelity Contrafund, and MFS Mid Cap Growth Fund significantly underperformed their benchmarks and displayed poor risk-adjusted returns for years;

    b. Defendants failed to move the Plan assets invested in the Fidelity TDFs / Commingled Pools and in the Fidelity Contrafund into available, cheaper share classes, for which the Plan had qualified throughout the Relevant Time Period.

231. The persistent, years-long failure by Defendants to notice, appreciate, and/or take action to protect the Plan from the glaring red flags in cost and performance evidences fatal deficiencies in the process by which Defendants monitored, evaluated, and retained the investments on the menu and the expenses of the Plan.

232. Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B).

233. As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, Plaintiff and Plan participants and beneficiaries suffered unreasonable and unnecessary monetary losses.

234. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breach of fiduciary duty alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2). Total losses to the Plan will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been available to the Plan's participants to date.

235. CIRI's and the CIRI Board of Directors' failure to monitor their appointees on the Committee enabled the Committee to breach its own duties to monitor the performance and costs of the Plan's investments. Therefore, CIRI and the CIRI Board of Directors are liable for the breaches of the Committee under ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2).

236. None of the Defendants made any efforts to remedy the breaches of the other Defendants. Therefore, to the extent any Defendant had knowledge of any other Defendant's breach of duty, it will be liable for the other Defendant's breach under ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries Under ERISA**
**Against Defendants CIRI and the CIRI Board of Directors**

237. Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

238. Defendants CIRI and the CIRI Board of Directors had the authority to appoint and remove members or individuals responsible for Plan investment management on the Committee, and they were aware that these fiduciaries had critical responsibilities for the Plan.

239. In light of this authority, CIRI and the CIRI Board of Directors had a duty to monitor those individuals responsible for Plan investment management on the Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

240. CIRI and the CIRI Board of Directors had a duty to ensure that the individuals responsible for Plan investment management on the Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information;

maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to CIRI.

241. CIRI and the CIRI Board of Directors breached their duty to monitor the Committee by failing to monitor for, proactively prevent, and/or retroactively remedy the Committee's failure to monitor the performance and fees of the Funds, even though the Committee:

a. Was charged with reviewing the Funds' performance and fees on a regular basis; and

b. Was authorized to remove the Funds from the menu for underperformance or excessive fees; but

c. Failed to remove the Funds from the menu, despite years of signals that the Fidelity TDFs, / Commingled Pools, Fidelity Contrafund, and MFS Mid Cap Growth Fund consistently and significantly underperformed their benchmarks; and

d. Ignored for years the cost savings presented by the available cheaper share classes of the Fidelity TDFs / Commingled Pools and Fidelity Contrafund, for which the Plan qualified; and thus

e. Was either (1) not performing its duties to monitor the performance and fees of the Funds at all, or (2) performing its duties in a manner not in compliance with the terms of the plan, the statutory standards, or the needs of the plan.

242. That the above behavior by the Committee persisted for years demonstrates deficiencies in the process by which CIRI and the CIRI Board of Directors reviewed the

Committee's performance. CIRI and the CIRI Board of Directors were either not reviewing the Committee's performance at all, not reviewing it with sufficient regularity, or not reviewing it with sufficient rigor as to detect the Committee's breach of its fiduciary duties.

243. As a result of CIRI's and the CIRI Board of Directors' foregoing breaches of the duty to monitor, Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses. Had CIRI and the CIRI Board of Directors discharged their fiduciary duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.

244. Pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), CIRI and the CIRI Board of Directors are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. Plaintiff and the Class are also entitled to equitable relief and other appropriate relief as appropriate.

## THIRD CLAIM FOR RELIEF
### Prohibited Transactions
### Against Defendant CIRI

245. Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

246. ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), requires a plan fiduciary to refrain from engaging in a transaction if he knows or should know that the transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest.

59

247. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), requires a plan fiduciary to refrain from engaging in a transaction if he knows or should know that the transaction constitutes a transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

248. By exercising authority and/or control with respect to the management of the Plan and their assets, and/or by being designated in the governing document of the Plan as a fiduciary within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), Defendant CIRI is a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), and ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

249. As an investment advisor to the Plan, UBS is a party in interest to the Plan within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14).

250. As the Plan's recordkeeper and custodian, Fidelity is a party in interest to the Plan within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14).

251. CIRI violated ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), by engaging in a series of transactions that it knew or should have known constituted a direct or indirect furnishing of goods, services, or facilities between the Plan and UBS as a party in interest. Namely, per the Plan's Forms 5500, CIRI paid UBS directly from Plan assets during the Relevant Time Period, with all dollars deducted from every participant with an account balance.

252. CIRI violated ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), by engaging in a series of transactions that it knew or should have known constituted a transfer to, or use by or for the benefit of a party in interest, of Plan assets. Namely, it paid UBS

from Plan assets during the Relevant Time Period, and it maintained revenue-sharing share classes that transferred Plan assets to Fidelity, a party in interest, through the participants' expense ratios.

253. As a fiduciary, CIRI is liable for these violations of ERISA §§ 406(a)(1)(C) and (D), 29 U.S.C. §§ 1106(a)(1)(C) and (D), pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

254. As a direct and proximate result of CIRI's prohibited transactions, the Plan has suffered damages that continue to accrue.

255. CIRI is liable to make good to the Plan as a whole the losses resulting from the aforementioned violations, and to restore to the Plan any profits resulting from the violations alleged in this Claim for Relief. CIRI is subject to other Plan-wide equitable or remedial relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Luke Layman, on behalf of himself, the Class, and the Plan, prays the Court for a judgment against Defendants as follows:

1. Find and adjudge that Defendants have breached their fiduciary duties as described above;

2. Find and adjudge that Defendants are personally liable to make good to the Plan the losses to the Plan as a whole resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duties;

3. Order the Defendants to make good to the Plan as a whole the losses resulting from each breach of fiduciary duty and to restore to the Plan any profits resulting from each breach of fiduciary duty;

4. Find and adjudge that the Defendants are liable to the Plan for appropriate Plan-wide equitable relief, including but not limited to restitution and disgorgement;

5. Determine the method by which losses to the Plan under ERISA § 409(a), 29 U.S.C. § 1109(a), should be calculated;

6. Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under ERISA § 409(a), 29 U.S.C. § 1109(a);

7. Impose surcharges against Defendants and in favor of the Plan for all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

8. Order the proceeds of any Plan-wide recovery for the Plan to be allocated to the accounts of members of the Class to make them whole for any injury that they have suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

9. Certify the Class, appoint the Plaintiff as class representative;

10. Award to the Plaintiff and the Class their attorney's fees and costs under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), and the common fund doctrine;

11. Order Defendants to pay interest to the extent allowed by law; and

12. Grant such other equitable or remedial relief as the Court deems proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

This the 11th day of June, 2026.

Respectfully submitted,

/s/ Joshua B. Cooley
Joshua B. Cooley (AK#1409065)
Katherine Elsner (AK#1411116)
**EHRHARDT, ELSNER & COOLEY**
215 Fidalgo Ave, Suite 201
Kenai AK 99611
Phone: (907) 283-2876
Fax: (907) 283-2896
josh@907legal.com
katie@907legal.com


Matthew E. Lee*
N.C. Bar No.  35405
Jeremy R. Williams*
N.C. Bar No. 48162
Mark Sigmon*
N.C. Bar No. 37762
Kyle A. Medin*
N.C. Bar No. 54920
**LEE SEGUI PLLC**
421 N. Harrington Street
Suite 460
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5035
mlee@leesegui.com
jwilliams@leesegui.com
msigmon@leesegui.com
kmedin@leesegui.com

Gary M. Klinger*
Abigail M. Cody^
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100

Chicago, IL 60606
Phone: 866.252.0878
gklinger@milberg.com
acody@milberg.com


*Attorneys for Plaintiff, the Plan, and the Proposed Class*

\*motion for admission *Pro Hac Vice* forthcoming
^ admitted *Pro Hac Vice*